Slip Op. 05-100

UNITED STATES COURT OF INTERNATIONAL TRADE

```
- - - - - - - - - - - - - - - -x
                                 :
DECCA HOSPITALITY FURNISHINGS,   :
LLC,                             :
               Plaintiff,        :
                                 :
MARIA YEE INC., ET AL.,          :
                                 :
    Plaintiff-Intervenors,       :    Before: Pogue, Judge
                                 :
            v.                   :
                                 :
UNITED STATES,                   :
                                 :    Court No. 05-00002
               Defendant,        :
                                 :
AMERICAN FURNITURE               :
MANUFACTURERS COMMITTEE FOR      :
FAIR TRADE, ET AL.,              :
                                 :
    Defendant-Intervenors.       :
- - - - - - - - - - - - - - - -x
```

OPINION

[Department of Commerce's determination remanded.]

Dated: August 23, 2005

Dewey Ballantine LLP (Harry L. Clark, David A. Yocis, and Mayur R. Patel) for the plaintiff;

Arent Fox PLLC (Nancy A. Noonan and Patricia P. Yeh) for plaintiff-intervenors;

Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director, Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Michael D. Panzera); Rachel Wenthold, Attorney, Of Counsel, Office of Chief Counsel for Import Administration, U.S. Department of Commerce, for the defendant;

King & Spalding LLP (Joseph W. Dorn, Stephen A. Jones, and Jeffrey M. Telep) for defendant-intervenors.

Pogue, Judge: This case involves a challenge by Decca Hospitality Furnishings, LLC ("Decca") to the Department of Commerce's ("Commerce" or "Defendant" or "Department") determination in Wooden Bedroom Furniture from the People's Republic of China, 69 Fed. Reg. 67,313, 67,315 (Dep't Commerce Nov. 17, 2004) (final determination of sales at less than fair value) ("Final Determination"). Decca asserts that, in the Final Determination, Commerce denied Decca separate rate status because Commerce improperly rejected its evidence as untimely. Commerce avers that Decca failed to timely submit a response to Commerce's Section A Questionnaire which it required to qualify for a separate rate. Because the court agrees that Commerce impermissibly rejected Decca's evidence, it remands this case for further consideration consistent with this opinion.[1]

**BACKGROUND**
**A.**

Commerce considers the PRC to have a non-market economy ("NME"). In dumping investigations of NME economies, Commerce presumes that all companies operating in a NME are state-controlled. See Silicon Carbide from the People's Republic of

---

[1]Decca moved for, and was granted, expedited consideration on Counts I and II of its complaint. Order Granting Mot. Expedited Consideration, Mar. 16, 2005. Because the court is remanding this case for further consideration, and the results of Commerce's redetermination may alter the need to address the remaining counts of Decca's complaint, the court reserves judgment on those counts.

China, 59 Fed. Reg. 22,585, 22,586, 22,589 (Dep't Commerce May 2, 1994) (notice of final determination of sales at less than fair value); Sparklers from the People's Republic of China, 56 Fed. Reg. 20,588, 20,589 (Dep't Commerce May 6, 1991) (final determination of sales at less than fair value) ("Sparklers"). Commerce further presumes that all state-controlled companies are part of a single entity. Consequently, Commerce establishes a single rate for all state-controlled companies. While Commerce presumes that all companies are under state-control, a company may rebut this presumption, and therefore qualify for an antidumping duty rate separate from the PRC-wide rate, if it demonstrates de jure and de facto independence from government control.

Despite considering the PRC to be a NME, Commerce recognizes that companies organized outside of China are per se independent from the control of the PRC government. Once a party demonstrates that it is foreign owned, Commerce accords that company a rate separate from the PRC-wide rate. Furthermore, Hong Kong is considered to be fully autonomous from China for economic and trade matters. 22 U.S.C. § 5713(3)(2000). Accordingly, if a company doing business in the PRC demonstrates that it is organized under the laws of Hong Kong, Commerce exempts that company from the PRC-wide rate. Fresh Garlic from the People's Republic of China, 67 Fed. Reg. 51,822, 51,823 (Dep't Commerce Aug. 9, 2002) ("Garlic") (preliminary results of antidumping duty administrative review,

partial rescission of administrative review, and intent to rescind administrative review in part).  In large investigations, like this one, Commerce will assign individualized separate rates to certain participants in the investigation, i.e., the mandatory respondents, but will assign all other qualifying companies a rate equal to the "weighted-average margin based on the rates [Commerce] calculate[s] for the [] mandatory respondents, excluding any rates that are zero, de minimis, or based entirely on adverse facts available." Wooden Bedroom Furniture from the People's Republic of China, 69 Fed. Reg. 35,312, 32,323 (Dep't Commerce June 24, 2004) (notice of preliminary determination and postponement of final determination) ("Preliminary Determination").

The presumption of state-control has met with judicial approval because respondents have "the best access to information pertinent to the 'state-control' issue," Sigma Corp. v. United States, 117 F.3d 1401, 1406 (Fed. Cir. 1997), and a significant percentage of the companies in the PRC are controlled by the PRC government.

**B.**

On December 17, 2003, Commerce began an investigation of exporters/producers of wooden bedroom furniture from the PRC in response to a petition filed by the domestic industry.  See Wooden Bedroom Furniture from the People's Republic of China, 68 Fed. Reg. 70,228 (Dep't Commerce Dec. 17, 2003) (initiation of antidumping

duty investigation) ("<u>Notice of Initiation</u>").    In its <u>Notice of Initiation</u>, Commerce specified that it would follow its statutory and regulatory time limits. <u>Notice of Initiation</u>, 68 Fed. Reg. at 70,231.    The Department's regulations are stated in <u>Antidumping Duties; Countervailing Duties</u>, 62 Fed. Reg. 27,296, 27,323 (Dep't Commerce May 19, 1997) ("<u>Preamble</u>"), which announced and explained Commerce's current rules as promulgated in the Code of Federal Regulations.    The <u>Notice of Initiation</u> also included contact information for parties interested in seeking "further information."  <u>Id.</u> at 70,228.

During the early stages of this investigation, Commerce asked for information, in the form of two questionnaires,[2] from exporters/producers of furniture that were within the scope of the investigation.    On December 30, 2003, Commerce sent the first questionnaire, a quantity and value questionnaire ("Q&V Questionnaire"), to the Chinese Ministry of Commerce ("MOFCOM")[3]

_____

[2]Commerce sent out more than two questionnaires during the course of the investigation.    However, as is relevant here, the court will limit its discussion to just these two questionnaires.

[3]One of MOFCOM's self-described "main mandate[s]" is "[t]o formulate . . . guidelines and policies of domestic and foreign trade and international economic cooperation."  Ministry of Commerce of the People's Republic of China Website, MISSION (2005), http://english.mofcom.gov.cn/mission/mission.html.  As part of its mandate, MOFCOM is responsible for guiding and coordinating "domestic efforts in responding to foreign antidumping, countervailing, and safeguard investigations and other issues concerned."  <u>Id.</u>

and 211 known producers of wooden bedroom furniture in the PRC. Preliminary Determination, 69 Fed. Reg. at 35,313; Def.'s Mem. Opp'n Pl.'s R. 56.2 Mot. J. Agency R. 3 ("Def's Mem."). In its letter to MOFCOM, Commerce sought MOFCOM's "support in identifying and transmitting [its] request for information to any Chinese producer and/or exporter of wooden bedroom furniture that exported wooden bedroom furniture for sale to the United States during the [period of investigation]." Letter from Edward Yang, Office Director, AD/CVD Enforcement Group III to Liu Danyang, Director, Bureau of Fair Trade for Imports and Exports, Re: Antidumping Duty Investigation of Wooden Bedroom Furniture from the People's Republic of China, P.R. Doc. 140, Pl.'s Ex. 3 at 1 (Dec. 30, 2003). Additionally, the letter stated in bold print:

> Please be advised that receipt of the quantity and value questionnaire by producers/exporters of the subject merchandise does not indicate that they will be chosen as a mandatory respondent or guaranteed separate rates status in this antidumping duty investigation.

Id. at 2.

The letters sent to individual producers and exporters had a virtually verbatim disclaimer noting that respondents would not be guaranteed a separate rate status by responding to the questionnaire. Letter from Robert A. Bolling, Program Manager Group III, Office IX, to All Interested Parties, P.R. Doc 139, Pl.'s Ex. 4 (Dec. 30, 2003). Commerce received 137 responses to this initial questionnaire. Preliminary Determination, 69 Fed.

Reg. at 35,313. However, Commerce "did not receive any type of communication from the Government of the PRC in response to" its letter to MOFCOM. Id.

Commerce sent the second questionnaire, a Section A Questionnaire,[4] on February 2, 2004. Unlike the Q&V Questionnaire, Commerce sent the Section A Questionnaire only to (a) MOFCOM and (b) seven companies it deemed to be mandatory respondents. The February 2, 2004 letter to MOFCOM specified that "[a]ll parties are requested to respond to section A (General Information) of the Non Market Economy ("NME") questionnaire by February 23, 2004." Letter from Robert Bolling, Program Manager AD/CVD Enforcement III to Liu Danyang, Director Bureau of Fair Trade for Imports and Exports, Pl.'s Ex. 5, P.R. Doc. 297 at 2 (emphasis in original). A generic Section A Questionnaire was also available on Commerce's website.

---

[4]According to Commerce, "Section A of the questionnaire requests general information concerning a company's corporate structure and business practices, the merchandise under investigation that it sells, and the manner in which it sells that merchandise in all of its markets. Section B requests a complete listing of all home market sales, or, if the home market is not viable, of sales in the most appropriate third-country market (this section is not applicable to respondents in non-market economy (NME) cases). Section C requests a complete listing of U.S. sales. Section D requests information on the factors of production (FOP) of the subject merchandise under investigation. Section E requests information on further manufacturing." Certain Ball Bearings and Parts Thereof from the People's Republic of China, 67 Fed. Reg. 63,609, 63,609 n.2 (Dep't Commerce Oct. 15, 2002) (notice of preliminary determination of sales at less than fair value and postponement of final determination); see also Preamble, 62 Fed. Reg. at 27,334.

The Section A Questionnaire itself informed parties that "[a]ll companies requesting a separate rate must respond to the following questions." Section A Questionnaire, P.R. Doc. 297 at A-1. Commerce received 126 Section A responses from parties. Preliminary Determination, 69 Fed. Reg. at 35,313-14. The PRC did not respond to this questionnaire either. Id. at 35,321.

In its preliminary determination issued on June 24, 2004, Commerce assigned a separate rate to respondent companies who timely submitted responses to the Section A Questionnaire and who demonstrated sufficient independence, i.e., both de jure and de facto independence from government control. Preliminary Determination, 69 Fed. Reg. 35,312, 35,319-20. All companies (other than the mandatory respondents), which sufficiently demonstrated that they were organized under the laws of Hong Kong, were granted a separate rate of 6.65%. Wooden Bedroom Furniture from China, 70 Fed. Reg. 329, 300 (Dep't Commerce Jan. 4, 2005) (notice of amended final determination of sales at less than fair market value and antidumping duty order). Commerce assigned all other parties a rate of 198.08%. Final Determination, 69 Fed. Reg. at 67,316.

## C.

Plaintiff, Decca, asserts that it is a Hong Kong based

producer and exporter of wooden bedroom furniture.[5]  Although Decca
was not specifically mentioned in the <u>Notice of Initiation</u> Commerce
sent it a Q&V Questionnaire.  Letter from Edward Yang, Office
Director, AD/CVD Enforcement Group III to Liu Danyang, Director,
Bureau of Fair Trade for Imports and Exports, Re: <u>Antidumping Duty</u>
<u>Investigation of Wooden Bedroom Furniture from the People's</u>
<u>Republic of China</u>, P.R. Doc. 140, Pl.'s Ex. 3 at 1 (Dec. 30, 2003).

Although Decca claims it did not receive the Q&V Questionnaire
directly from Commerce or MOFCOM, Decca, operating <u>pro se</u>, timely
submitted a response to the Q&V Questionnaire on January 8, 2004.[6]
Decca also claims it never received the Section A Questionnaire, or

---

[5]Accordingly, the court will assume that Decca can state a
case for asserting that Hong Kong is its place of incorporation,
and that therefore, Commerce must enter a finding of fact on this
question.  Commerce is, of course, free on remand, after
considering Decca's evidence, to conclude that Decca is not a
Hong Kong based corporation.

[6]Commerce rejected Decca's Q&V Questionnaire submission.
However, one of Commerce's purported reasons for rejecting
Decca's submission was that it was "submitted after the January
9, 2004 deadline."  Letter from Robert Bolling, Program Manager
Enforcement Group III, Office 9, to Spiro Kwan, Decca Furniture
Ltd., P.R. Doc. 448, Pl.'s Ex. 6 at 1 (Feb. 26, 2004); <u>cf.</u> Def.'s
Supp. at 3.  However, Commerce also acknowledged that the
response was submitted on January 8, 2004, <u>id.</u>, Dep't of Commerce
Mem. from Jeffrey May, Deputy Assistant. Sec'y for Imp. Admin. to
James J. Jochum, Assistant. Sec'y for Imp. Admin., Re: <u>Wooden</u>
<u>Bedroom Furniture from the People's Republic of China: Untimely</u>
<u>Section A Questionnaire Submission of Decca Furniture Ltd.</u>, P.R.
Doc. 1763, Pl.'s Ex. 14 at 2 (Sept. 16, 2004) ("Decision Memo"),
which would have made Decca's submission timely, i.e., submitted
before the January 9, 2004 deadline, Letter from Robert A.
Bolling, Program Manager, Group III, Office IX, to All Interested
Parties, P.R. Doc 139, Pl.'s Ex. 4 (Dec. 30, 2003).

information regarding the deadline for submitting responses to the Section A Questionnaire.[7] According to Decca, after submitting its response to the Q&V Questionnaire, it did not hear from Commerce until after March 2, 2004 when it received a letter from Commerce rejecting its response because of filing deficiencies.[8] In Commerce's letter to Decca explaining its rejection of Decca's Q&V Questionnaire response, Commerce informed Decca that "the rejection d[id] not prevent parties from filing additional information in this investigation." Letter from Robert Bolling, Program Manager, Enforcement Group III, Office 9, to Spiro Kwan, Decca Furniture Ltd., P.R. Doc. 448, Pl.'s Ex. 6 at 3 (Feb. 26, 2004). Commerce mailed the rejection letter after the February 24 deadline for submitting Section A responses. Decca attempted to refile its Q&V Questionnaire on June 8, 2004 and, in early July, attempted to submit other information pertaining to its status as a Hong Kong based company. Decision Memo, P.R. Doc. 1763, Pl.'s Ex. 14 at 2.

---

[7]In its determination, Commerce insisted that it only needed to take reasonable steps in providing notice, that the steps it took were reasonable, and therefore, consideration of whether Decca received actual and timely notice was unnecessary. Consequently, it did not make any factual findings on this question. Accordingly, the court will assume that MOFCOM never sent Decca the Section A Questionnaire. Commerce is free on remand, after considering the evidence, to conclude that Decca received the Questionnaire, or actual and timely notice thereof (through some means not stated in its determination or brief).

[8]Decca avers that it did not receive this notification. Because this fact is unnecessary in resolving this case in its current posture, the court expresses no view on this matter.

Commerce asserts that Decca missed the filing deadline for the Section A Questionnaire. Accordingly, pursuant to its presumptions, Commerce set Decca's antidumping duty rate at the PRC-wide rate. Plaintiff protests that determination, inter alia, claiming that Commerce failed to provide it with sufficient notice of both the requisite filing requirement for proving its entitlement to a separate rate, and the deadline for such a filing, and thereby improperly excluded the evidence Decca attempted to proffer establishing that it is entitled to a separate rate.[9]

Decca timely protested Commerce's determination. After consideration, Commerce denied Decca's request. Letter from Office to Dewey Ballentine, P.R. Doc. No. 1802 (Sept. 30, 2004). Decca sought timely review of Commerce's finding and properly invoked this court's jurisdiction under 28 U.S.C. 1581(c).

The court must sustain Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise

---

[9]Decca also argues that Commerce has its mailing address in the record and that this is substantial evidence that Decca is a Hong Kong based company. The court agrees with Commerce that this evidence, by itself, is insufficient to overcome Commerce's presumption. Companies may have multiple mailing addresses (or keep multiple mailing addresses for the purposes of securing separate rates). Nor does simply having a Hong Kong address mean that a company is incorporated under the laws of Hong Kong. So long as Commerce provides a sufficient opportunity to submit other relevant information, Commerce may require more than a mailing address before finding an interested party qualifies for a separate rate. Cf. Sigma, 117 F.3d at 1406-07 (allowing Commerce discretion to determine what evidence is sufficient to overcome the presumption of state-control).

not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B).  The court must defer to an agency's reasonable construction of an ambiguous statute.  <u>Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837, 842-843 (1984).  Likewise, the court may defer to an agency's interpretation of an <u>ambiguous</u> regulation, so long as that interpretation is not plainly erroneous or inconsistent with the regulation, does not fail to reflect the "agency's fair and considered judgment on the matter in question," <u>Auer v. Robbins</u>, 519 U.S. 452, 462 (1997), <u>Cathedral Candle Co. v. United States ITC</u>, 400 F.3d 1352, 1364 (Fed. Cir. 2005); <u>but cf. Keys v. Barnhart</u>, 347 F.3d 990, 993 (7th Cir. 1997) (Posner, J.), <u>Satellite Broad. Co. v. F.C.C.</u>, 824 F.2d 1, 3-4 (D.C. Cir. 1987) (where notice is at issue, a party cannot be faulted for relying on an alternative reasonable construction of the regulation), John F. Manning, *Constitutional Structure and Judicial Deference to Agency Interpretations of Agency Rules*, 96 COLUM. L. REV. 612, 655-60, 678-81 (1996), or, if adopted, does not render the regulation unreasonable or otherwise not in accordance with law, <u>Chevron</u>, 467 U.S. at 842-843 (1984).

In this case, if Commerce improperly rejected Decca's submissions, thereby improperly presuming Decca's place of incorporation (not to be Hong Kong), then Commerce's findings are unsupported by substantial evidence and the case must be remanded for Commerce to enter a factual finding.

## DISCUSSION
### I.

In <u>Transcom, Inc. v. United States</u>, 294 F.3d 1371, 1380 (Fed. Cir. 2002) ("<u>Transcom II</u>"), the court considered whether Commerce appropriately found that parties operating in China had failed to rebut the presumption of state-control where the importer had not received a questionnaire from Commerce and offered no evidence to rebut Commerce's presumption. The court found that, in light of the evidentiary requirements established by Commerce's substantive rules, a reasonable party would have known that it had to offer <u>some evidence</u> during the course of an investigation to rebut the presumption of state-control. <u>Id.</u> at 1381-82. Because the parties had failed to offer any evidence, the court concluded that it was appropriate for Commerce to presume that the parties were state-controlled. <u>Id.</u>

This case begins where <u>Transcom II</u> left off. Here, Decca did attempt to submit some evidence during the course of the investigation. Therefore, the question presented is whether Commerce appropriately rejected Decca's evidence. To resolve this question, the court must turn to fundamental principles of administrative law.

The court begins with the observation that it is axiomatic that agencies have authority to "fashion their own rules of procedure," even when a statute does not specify what process to use. <u>Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.</u>, 435 U.S. 519, 544 (1978). But this power is not unlimited.

Rather, an agency's rules of procedure must be reasonable,[10] an agency must follow its stated rules of procedure,[11] and must provide sufficient notice of its rules of procedure.[12]  Indeed, substantial evidence review (on the record) would not be a meaningful exercise if the "evidence" that comprised the record was obtained through an arbitrary procedure.

Furthermore, because regulations define the expected course of agency conduct, such regulations define the reasonable expectations of interested parties and the reasonable efforts they must undertake to vindicate their rights in an investigation.  See NEC Corp. v. United States, 151 F.3d 1361, 1371 (Fed. Cir. 1998) ("there inheres in a statutory scheme such as this an expectation that those charged with its administration will act fairly and honestly."); Shikoku Chems. Corp. v. United States, 16 CIT 382,

---

[10]Chevron USA Inc. v. United States, 467 U.S. 837, 842-43 (1984); cf. Mathews v. Eldridge, 424 U.S. 319, 335 (1976).

[11]Bennett v. Spear, 520 U.S. 154, 172 (1997); Morton v. Ruiz, 415 U.S. 199, 235 (1974), Kemira Fibres Oy v. United States, 61 F.3d 866, 871 (Fed. Cir. 1995); cf. Ariz. Grocery Co. v. Atchison, Topeka & Santa Fe Ry. Co., 284 U.S. 370, 389 (1938) (agencies cannot retroactively modify regulations through adjudications), Breyer et al., ADMINISTRATIVE LAW AND REGULATORY POLICY 601-02 (5th ed. 2002).

[12]City of W. Covina v. Perkins, 525 U.S. 234, 241-42 (1999); Morton v. Ruiz, 415 U.S. at 232; Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 14 (1978); New York v. New York, N. H. & H. R. Co., 344 U.S. 293, 296-97 (1953);  Satellite Broad. Co. v.F.C.C., 824 F.2d 1, 3-4 (D.C. Cir. 1987); Freedom of Information Act, 5 U.S.C. § 552(a)(1); cf. 1 William Blackstone, COMMENTARIES 46 (William S. Hein & Co., Inc. 1992).

388, 795 F. Supp. 417, 421 (1992) ("Commerce is required to administer the antidumping laws fairly."); cf. Transcom, Inc. v. United States, 182 F.3d 876, 879 (Fed. Cir. 1999) ("Transcom I") ("But the fact that a party agrees to abide by the results of an administrative determination does not mean that the party has no right to complain of irregularities in the proceeding leading to that determination.").

According to its governing statute, Commerce is required to investigate allegations of dumping by foreign producers/exporters. 19 U.S.C. § 1671a. To this end, Commerce's regulations state that it "obtains most of its factual information in antidumping and countervailing duty proceedings from submissions made by interested parties during the course of the proceeding." 19 C.F.R. § 351.301(a) (2004). In this case, Commerce specifically noted in its Notice of Initiation that it would follow the rules and procedures as specified in its regulations. Notice of Initiation, 68 Fed. Reg. at 70,231.

Commerce's regulations, however, do not establish precise deadlines for submitting questionnaire responses; nor do they specify which questionnaire response is necessary to request a separate rate. Rather, Commerce's regulations specify two possible deadlines: (1) a deadline in which a "submission of factual information is due no later than . . . seven days before the date of verification of any person is scheduled to commence," 19 C.F.R. § 351.301(b)(2); and (2) a specific deadline which is established

by "the Secretary's written request to [each] interested party," 19 C.F.R. § 351.301(c)(2)(ii); Preamble, 62 Fed. Reg. at 27,333 (stating that the Secretary will provide notice to each interested party).[13]  Additionally, when Commerce invokes 19 C.F.R. § 351.301(c)(2)(ii), its regulations further provide that the Secretary must state in such written request:

> [T]he information to be provided; the form and manner in which the interested party must submit the information; and that failure to submit requested information in the requested form and manner by the date specified may result in use of the facts available under section 776 of the Act and § 351.308.

19 C.F.R. § 351.301(c)(2)(ii).   In its Federal Register notice accompanying this rule Commerce explained: "Section 351.301(c)(2) deals with questionnaire responses and other submissions on request.  Section 351.301(c)(2)(ii) provides that the Department must give notice of certain requirements to each interested party from whom the Department requests information." Preamble, 62 Fed. Reg. at 27,323 (emphasis added).

---

[13]Annex III to the Preamble also provides "[d]eadlines for parties in antidumping investigations." Preamble, 62 Fed. Reg. at 27,418.  Among the deadlines stated is a deadline for Section A responses (which is 51 days from the date of initiation.) Id. at 27,418-419.  However, the Annex also states that "[m]ost of the deadlines shown here are approximate.  The actual deadline in any particular segment of a proceeding may depend on the date of an earlier event or be established by the Secretary." Id. at 27,419.  Further, the Q&V Questionnaire is not mentioned in the Annex (an event precedent to the Section A Questionnaire in this case).  In this case, the deadline for Section A responses specified in Annex III would have been February 6, 2004 – well before the actual deadline of February 23, 2004.

In this case, Commerce relied upon Section 351.301(c)(2)(ii) and applied a specific deadline of February 24, 2004 for its Section A Questionnaire. As noted above, however, Section 351.301(c)(2)(ii) requires notice be given to "each interested party." The antidumping laws define the term "interested party" to include "a foreign manufacturer, producer, or exporter, or the United States importer, of subject merchandise." 19 U.S.C. § 1677(9)(A); see also 19 C.F.R. § 353.2(k). Decca is a foreign manufacturer and exporter of the subject merchandise. Moreover, according to Commerce, it was mandatory that Decca respond to the Section A Questionnaire to secure a separate rate. Therefore, Decca is an "interested party." However, despite the fact that Commerce appears to be required under these circumstances to give notice to each interested party of filing deadlines, the requested information, and the consequences for a party's failure to submit the requested information, Commerce did not send Decca a written request with such required information. Accordingly, Commerce appears to have violated its own stated procedure. As such, Commerce's actions would not be in accordance with law.

Commerce challenges this assertion in four ways: (A) that Decca was not, at the time Commerce issued the Section A Questionnaire, an interested party and therefore Commerce was not required to send it a questionnaire; (B) MOFCOM was a reliable means of transmitting the questionnaire to interested parties; (C) Commerce's consistent practice of requiring Section A submissions

provided notice to parties; and (D) Decca was required to inquire of Commerce's procedures.  Each point will be addressed in turn.

## A.

First, Commerce argues that because it presumes that all companies operating in the PRC are state-controlled, a party does not become an interested party unless and until it rebuts the presumption of state-control.[14]   Def.'s Supplemental Br. 1-3 ("Def.'s Supp.").  As in Transcom I, 182 F.3d at 884, Commerce's argument overstates the effect of its own presumption.  That Commerce creates a rebuttable presumption of state-control merely creates a burden of proof; it does not, in and of itself, create any actual agency relationship between MOFCOM and companies operating in the PRC.  When, as it is alleged here, there exists no actual agency relationship between MOFCOM and the interested party, by only sending the questionnaires to MOFCOM, Commerce does not provide any notice to the interested party on how to rebut the presumption.  See Schwarz v. Thomas, 222 F.2d 305, 308 (D.C. Cir. 1955) ("any agent who accepts service must be shown to have been authorized to bind his principal by the acceptance of process"), United States v. Marple Cmty. Record, Inc., 335 F. Supp. 95, 101 (E.D. Penn. 1971) ("[f]or service of process to be valid upon an agent, it must be shown that he was actually appointed by the

---

[14]This does not appear to be the rationale adopted by Commerce in its determination.  See Decision Memo, P.R. Doc. 1763, Pl.'s Ex. 14 at 4.

defendant for the specific purpose of receiving process."). Consequently, Commerce's proffered construction of its regulation is inconsistent with the stated purpose of its rule: to "give notice of certain requirements to <u>each</u> interested party from whom the Department requests information." <u>Preamble</u>, 62 Fed. Reg. at 27,333 (emphasis added). Furthermore, because Commerce does not have any other stated policies for how parties may rebut the presumption of state-control, Commerce's reading of its regulation would not provide parties with a meaningful opportunity to rebut its presumption; rather, Commerce's interpretation would convert what is just a rebuttable presumption into a self-fulfilling, though baseless, "fact." <u>McDonald v. Mabee</u>, 243 U.S. 90, 91 (1917) ("great caution should be used not to let fiction deny the fair play that can be secured only by a pretty close adhesion to fact."); compare <u>Transcom I</u>, 182 F.3d at 883 ("we recognized that the presumption is rebuttable, and that a party that is subject to the presumption has a right to attempt to rebut it.") with <u>Nelson v. Adams USA, Inc.</u>, 529 U.S. 460, 471 (2000) ("predictions about the outcome of hypothesized litigation cannot substitute for the actual opportunity to defend that due process affords every party against whom a claim is stated."). Such a result would render the presumption arbitrary, and accordingly, not in accordance with law.

Moreover, sending information on how to rebut the presumption of state-control only to MOFCOM, then treating the non-responsiveness of companies that did not receive the request for

information as proof that they are state-controlled, is not a reasonable means of obtaining the sought after information. Companies that are not state-controlled are the least likely to have any relationship with MOFCOM. Therefore, equating non-responsiveness with being under the authority of MOFCOM makes little sense.

Furthermore, judicial acceptance of Commerce's presumption rests, in part, on the notion that the parties themselves will have the best information to disprove state-control. See Sigma Corp. v. United States, 117 F.3d 1401, 1406 (Fed. Cir. 1997). Therefore, the companies, not MOFCOM, would be in the best position to proffer this evidence. However, Commerce's method does not seek this information from the parties by directly notifying them of this information request. Consequently, Commerce's proposed method of notifying parties would be contrary to a key justification for the presumption.

Nor is Commerce's interpretation consistent with its past practice. Cf. Marseilles Land & Water Co. v. FERC, 345 F.3d 916, 920 (D.C. Cir. 2003). In only three determinations cited by Commerce and Defendant-Intervenor has Commerce exclusively relied upon MOFCOM to inform parties of the Section A Questionnaire; in all other instances, Commerce has explicitly noted that it sent the questionnaires to all parties for whom it had information.[15] In at

---

[15]Compare Polyethylene Retail Carrier Bags from the People's
                                                    (footnote omitted)

_Republic of China_, 69 Fed. Reg. 3,544, 3,545 (Dep't Commerce Jan. 26, 2004) (notice of preliminary determination of sales at less than fair value) ("_Retail Carrier Bags_")(noting that Section A Questionnaires were sent "to all of the producers/exporters named in the petition and to the exporters who comprise the top 80 percent of exporters in terms of quantity imported" and resending letters to parties that did not respond); _Certain Color Television Receivers from the People's Republic of China_, 68 Fed. Reg. 66,800, 66,801 (Dep't Commerce Nov. 28 2003) (notice of preliminary determination of sales at less than fair value, postponement of final determination, and affirmative preliminary determination of critical circumstances) (noting that Commerce sent questionnaires to MOFCOM requesting it forward the questionnaires on, and courtesy copies to the Chinese Chamber of Commerce, "to all companies identified in U.S. customs data as exporters of the subject merchandise during the POI with shipments in commercial quantities," _and_ companies identified by domestic industry in the petition); _Garlic_, 67 Fed. Reg. at 51,823 (noting that Commerce would deem non-Hong Kong companies non-responsive because they had failed to reply to the questionnaire even though they had received questionnaires); _Certain Automatize Replacement Glass Windshields from the People's Republic of China_, 66 Fed. Reg. 48,233, 48,233 (Dep't Commerce Sept. 19, 2001) (notice of preliminary determination of sales at less than fair value) ("_Windshields_") ("the Department issued a questionnaire requesting volume and value of U.S. sales information to the Embassy of the PRC and to the Ministry of Foreign Trade and Economic Development, and sent courtesy copies to the following known producers/exporters of subject merchandise identified in the petition . . . and notified the PRC Government that it was responsible" for other companies for whom Commerce did not have information); _Certain Folding Gift Boxes from the People's Republic of China_, 66 Fed. Reg. 40,973, 40,975 (Dep't Commerce Aug. 6, 2001) (notice of preliminary determination of sales at less than fair value) (noting questionnaires had been sent to all producers/exporters listed in the petition _and_ the Chinese Government and further requested assistance in delivering the questionnaires); _Certain Preserved Mushrooms from the People's Republic of China_, 63 Fed. Reg. 41,794, 41,794 (Dep't Commerce Aug. 5, 1998) (notice of preliminary determination of sales at less than fair value and postponement of final determination) (sending questionnaires to the Chinese Chamber of Commerce, the Ministry of Foreign Trade and Economic Cooperation ("MOFTEC") (MOFCOM's predecessor), _and_ a courtesy copies to producers/exporters); _Freshwater Crawfish Tail Meat from the People's Republic of China_, 62 Fed. Reg. 14,392, 14,392 (Dep't

(footnote continued)

least one case, Commerce specifically cited the fact that the interested party had received the questionnaire before faulting the party for failing to timely respond.  See Garlic, 67 Fed. Reg. at 51,823.

Commerce's position is further undermined by its own practice in this case.  Commerce sent the initial Q&V Questionnaires, and the Section A Questionnaires intended for the mandatory respondents, directly to the parties notwithstanding Commerce's

---

Commerce March 26, 1997) (notice of preliminary determination of sales at less than fair value) (noting a) the non-responsiveness of MOFTEC; b) that questionnaires were sent to MOFTEC and all parties for which it had addresses; and c) that Commerce included instructions to MOFCOM to forward the questionnaire); with Certain Ball Bearings and Parts Thereof from the People's Republic of China, 67 Fed. Reg. 63,609, 63,609 (Dep't Commerce Oct. 15, 2002) (notice of preliminary determination of sales at less than fair value and postponement of final determination) (which may have relied upon MOFTEC to send questionnaires); Certain Non-Frozen Apple Juice Concentrate from the People's Republic of China, 64 Fed. Reg. 65,675, 65,676 (Dep't Commerce Nov. 23, 1999) (notice of preliminary determination of sales at less than fair value) ("Apple Juice") (sending questionnaires to "identified producers/exporters through their counsel or through the China Chamber (with copies to MOFTEC and the Embassy of the PRC), and requested that they assist in distributing it to all exporters who might request separate rates."); Bicycles from the People's Republic of China, 60 Fed. Reg. 56,567, 56,567 (Dep't Commerce Nov. 9, 1995) (notice of preliminary determination of sales at less than fair value) ("Bicycles") (sending original questionnaires to MOFTEC, and two Chambers of Commerce).  The court should note that Bicycles pre-dated Commerce's current rules. The court further notes that foreign governments are separately stated as being interested parties to antidumping duty investigations.  19 U.S.C. § 1677(9)(B). Additionally, the court notes that the myriad difficult approaches demonstrate that Commerce has not deemed its determinations to have precedential effect as to whom questionnaires should be sent.  Last the court notes that these are just the determination cited by Commerce and Defendant-Intervenor.

presumption.    Significantly, Commerce addressed the letter accompanying the Q&V Questionnaire "to all interested parties." Letter from Robert A. Bolling, Program Manager, Group III, Office IX, to All Interested Parties, P.R. Doc 139, Pl.'s Ex. 4 (Dec. 30, 2003); see also Letter from Robert Bolling, Program Manager Enforcement Group III, Office 9, to Spiro Kwan, Decca Furniture Ltd., P.R. Doc. 448, Pl.'s Ex. 6 at 1 (Feb. 26, 2004) ("It is the Department's goal to make every effort to ensure that all interested parties have an opportunity to respond . . . .") (emphasis added).    Such practices are inconsistent with viewing MOFCOM as the spokesperson or agent of all companies operating in China.    Rather, these practices evidence the fact that Commerce has recognized that parties qualify as interested parties, and act outside of the control of the Chinese government, before these parties have submitted information to rebut the presumption of state-control.[16]

Accordingly, the court that finds that Decca is an "interested

---

[16]To the extent Commerce's reading of Decca's status is correct, Commerce's position would be even more problematic. Given that Decca would not have been an "interested party," 19 C.F.R. § 351.301(c)(2)(ii) would not apply.  Therefore, only 19 C.F.R. § 351.301(b) would be the appropriate method of submitting this information.  Any procedural rule requiring parties to request a Section A Questionnaire from Commerce, or MOFCOM, is not a possible reading of the 19 C.F.R. § 351.301(c)(2)(ii) requirement that the Secretary provide a written request for said information.  Therefore, any such required procedure would have to be separately stated in the Federal Register to have any force or effect (even if it is a consistent policy of Commerce). Freedom of Information Act, 5 U.S.C. § 552(a)(1).

party" within meaning of Section 351.301(c)(2)(ii).

**B.**

Alternatively, Commerce alleges that its reliance on MOFCOM to redirect the Section A Questionnaires to interested parties was reasonable.  More specifically, Commerce alleges that MOFCOM has been reliable in the past, and that some parties in this case responded to the questionnaire even though they did not receive it directly from Commerce,[17] and therefore relying on MOFCOM to deliver the questionnaires was reasonable.  Decision Memo, P.R. Doc. 1763, Pl.'s Ex. 14 at 4; but see, e.g., Preliminary Determination, 69 Fed. Reg. at 35,313, 35,321 (noting that the government of China was non-responsive); Saccharin From the People's Republic of China, 67 Fed. Reg. 79,049, 79,050 (Dep't Commerce Dec. 27, 2002) (notice of preliminary determination of sales at less than fair value)

---

[17]Neither Commerce nor Defendant-Intervenor offer a single citation indicating that this is a relevant factor; indeed, this argument has been implicitly rejected in all the cases cited by the court.  To the extent that such a factor could be relevant, probabilities, rather than raw numbers, would be the relevant figures. Cf. Dusenbery v. United States, 534 U.S. 161, 179 (2002) (Ginsberg J. dissenting); United States v. Carroll Towing Co., 159 F.2d 169, 173 (2d Cir. 1947) (Hand, J.).  Commerce has failed to substantiate why it deems MOFCOM to be reliable. Courts do "not defer to the agency's conclusory or unsupported suppositions." McDonnell Douglas Corp. v. United States Dep't of the Air Force, 375 F.3d 1182, 1187 (D.C. Cir. 2004) (citing Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)), especially where the Supreme Court has found that such means of providing notice, where other means are available, is facially unreasonable.

(same); Certain Cased Pencils from the People's Republic of China, 67 Fed. Reg. 2402, 2403 n.1 (Dep't Commerce Jan, 17, 2002) (preliminary results and recision in part of antidumping duty administrative review) (noting frustration with the Chinese government's lack of cooperation).

Commerce's regulations, however, require it to send written requests to interested parties.  Although this language may not require Commerce to provide actual notice of a request for information, Dusenbery v. United States, 534 U.S. 161, 166, 170 (2002) (interpreting a similarly worded statutory provision coextensive with the Due Process Clause), but cf. Freedom of Information Act, 5 U.S.C. 552(a)(1), Static Random Access Memory Semiconductors from Taiwan, 63 Fed. Reg. 8909, 8919 (Dep't Commerce Feb. 23, 1998) (notice of final determination of sales at less than fair value) ("Taiwan Semiconductors"), the means Commerce employs must nonetheless be reasonably calculated under the circumstances to provide actual notice,  New York v. New York, N. H. & H. R. Co., 344 U.S. 293, 296-97 (1953); cf. Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 13 (1978) (citing Mullane v. Central Hanover Bank, 339 U.S. 306, 314 (1952)).

In this case, Commerce's method of notice was not reasonably calculated to provide parties with actual notice of the filing requirements.  Commerce relied on an organ of the Chinese government to notify parties, i.e., MOFCOM.  The Supreme Court has held that reliance on government instrumentalities to provide

notice to interested parties, where the government instrumentality is not required to retransmit notice onto the interested parties, does not create a reasonable probability of providing actual notice. Wuchter v. Pizzutti, 276 U.S. 13, 24-25 (1928), Koster v. Automark Indus., Inc., 640 F.2d 77, 81 n.3 (7th Cir. 1981) ("a statutory provision is not reasonably calculated to provide notice unless its terms relating to the sending of notice are mandatory"); cf. Howard v. Jenny's Country Kitchen, Inc., 223 F.R.D. 559, 565-66 (D. Kan. 2004) (canvassing extensive authority on this question). This rule has been consistently applied even where the service occurs in a foreign country. See Koster, 640 F.2d at 81 n.3, De la Mata v. Am. Life Ins. Co., 771 F. Supp. 1375, 1386-87 (D. Del. 1991), aff'd 961 F.2d 208 (3rd Cir. 1992) (unpublished table decision), Boivin v. Talcott, 102 F. Supp. 979, 80-81 (N.D. Ohio 1951); cf. Volkswagenwerk Aktiengesellschaft v. Schlunk, 486 U.S. 694, 709-10 (1989) (Brennan, J. concurring), Ma v. Continental Bank N.A., 905 F.2d 1073, 1076 (7th Cir. 1990). As the court in Koster v. Automark explained, "[t]hat the [foreign government] as a matter of practice may exercise its discretion to serve process in some reasonable manner is not dispositive, since '[t]he right of a citizen to due process of law must rest upon a basis more substantial than favor or discretion.'" Koster v. Automark Industries, Inc., 640 F.2d at 81 n.3 (quoting Roller v. Holly, 176 U.S. 398, 409 (1900)); cf. Pencils, 67 Fed. Reg. at 2402 n.1. Accordingly, Commerce's reliance on MOFCOM as its method of

providing notice is not supported by established jurisprudence.

In addition, it is axiomatic that Commerce may not exercise its authority in an arbitrary or capricious manner. See, e.g., Tung Mung Dev. Co. v. United States, 354 F.3d 1371, 1378 (Fed. Cir. 2004). This is especially true where Commerce itself has stated that it must do something. Preamble, 62 Fed. Reg. at 27,333, Taiwan Semiconductors, 63 Fed Reg. at 8,919 (explaining Commerce's questionnaire policy). This principle is clearly broad enough to apply when Commerce requests other parties to act on its behalf. Consequently, if Commerce's method of notice relied on no more than MOFCOM's "favor or discretion," Commerce's actions here cannot be in accordance with law. Just as "[i]t is rudimentary administrative law that [agency] discretion as to substance of the ultimate decision does not confer discretion to ignore the required procedures of decisionmaking," Bennett v. Spear, 520 U.S. 154, 174 (1997), it is also rudimentary that discretion as to substance does not license an agency to adopt an arbitrary or capricious procedure.

In this case, MOFCOM does not appear to have acceded to any responsibilities in retransmitting the information onto Hong Kong corporations. Nor did Commerce even request MOFCOM to forward the Section A Questionnaire on to third parties. Cf. supra at note 15. Consequently, Commerce's method of providing notice in this case was not more than a "mere gesture . . . [not] one desirous of actually informing the" party of its procedural rules. Mullane v.

Central Bank of Hanover, 339 U.S. 306, 315 (1950); cf. Pencils, 67 Fed. Reg. at 2403 n.1.

Consequently, the court finds that Commerce's reliance on MOFCOM as a means of getting questionnaires to interested parties was not reasonable. Accordingly, Commerce's actions did not comply with its own regulations.

## C.

Commerce argues, as a fallback position, that even if Decca was not provided notice by MOFCOM, it still should have known of the Section A Questionnaire because previous determinations have made reference to Section A Questionnaires. Cf. City of West Covina v. Perkins, 525 U.S. 234, 237 (1999). Commerce's argument is not that the Section A requirement is stated or implied by its regulations, but rather, that Decca was required to deduce the Section A requirement through recourse to Commerce's prior determinations. This argument is unpersuasive.

First, in light of Commerce's unambiguously declared policy to provide direct notice, it is at best unclear why a party should have felt any need to canvass through Commerce's prior determinations. Cf. Parsons v. United States, 670 F.2d 164, 166 (Ct. Cl. 1982) ("It is well established that there is a presumption that public officers perform their duties correctly, fairly, in good faith, and in accordance with law and governing regulations. . . .") (emphasis added); Marseilles Land & Water Co. v. FERC, 345

F.3d 916, 920 (D.C. Cir. 2003).[18]  Nor did Commerce's letter accompanying the Q&V Questionnaire provide notice that something more than a Q&V Questionnaire response was required.  The letter stated that submitting a Q&V Questionnaire did not "guarantee[] [Decca] a separate rate status."  Letter from Edward Yang, Office Director, AD/CVD Enforcement Group III to Liu Danyang, Director, Bureau of Fair Trade for Imports and Exports, Re: <u>Antidumping Duty</u>

---

[18]Furthermore, the Freedom of Information Act, 5 U.S.C. § 552(a)(1)(C) requires agencies to either <u>separately state</u> their <u>rules of procedure</u> in the Federal Register or provide parties with actual and timely notice of such rules.  <u>United States v. Aarons</u>, 310 F.2d 341, 348 (2d Cir. 1965); <u>Hoenig Plywood Corp. v. United States</u>, 51 Cust. Ct. 336, 347 (1963) <u>Neighborhood Legal Servs, Inc. v. Legal Servs., Corp.</u>, 466 F. Supp. 1148, 1153-54 (D. Conn. 1979) (discussing the Freedom of Information Act's amendments to  5 U.S.C. § 552(a)(1)).  According to the legislative history:

> Since the [APA] leaves wide latitude for each agency to frame its own procedures, this subsection requiring agencies to state their organization and procedures in the form of rules is essential for the information of the public.  The publication must be kept up to date.  The enumerated classes of informational rules must also be separately stated so that, for example, rules of procedure will be separate from rules of substance, interpretation or policy . . . . The requirement that no one shall 'in any manner' be required to resort to unpublished organization or procedure protects the public from being required to pursue remedies that are not generally known.

S. Rep. No. 752 at 198 (Nov. 19, 1945); <u>see also</u> <u>id.</u> ("The section has been drawn [based] upon the theory that administrative operations and procedures are public property which the general public, rather than a few specialists or lobbyists, is entitled to know or to have the ready means of knowing with <u>definiteness</u> and <u>assurance</u>.") (emphasis added); <u>see also</u> U.S. Dep't of Labor, Office of Administrative Law Judges, ATTORNEY GENERAL'S MANUAL ON THE ADMINISTRATIVE PROCEDURE ACT (1947) (2005), <u>http://www.oalj.dol.gov/public/apa/refrnc/ag02.htm</u> (Section 3(a)).

Investigation of Wooden Bedroom Furniture from the People's Republic of China, P.R. Doc. 140, Pl.'s Ex. 3 at 1 (Dec. 30, 2003). Commerce reads this language as placing parties on notice that they had to fill out different forms to qualify for a separate rate. This is, perhaps, a reading of this language. However, a better reading is that Commerce was reserving the right to request additional information. After all, the disclaimer also noted that parties would not necessarily be chosen as mandatory respondents – that language did not suggest, however, that parties could not be so chosen, and, in fact, some parties were chosen; likewise, the disclaimer did not state that the Q&V Questionnaire submission could not be sufficient for an interested party to qualify for a separate rate. Especially where Commerce requested Q&V Questionnaire responses directly from the parties, there is no apparent reason why a party should have felt that it must undertake the responsibility for determining what additional information was required without receiving direction from Commerce. New York v. New York, N. H. & H. R. Co., 344 U.S. 293, 296-97 (1953).

Second, the cited determinations do not undermine Decca's reasonable expectation that Commerce would follow its declared policies. In all but three determinations cited by Commerce and Defendant-Intervenor, Commerce took efforts to send questionnaires directly to the parties. See supra at note 15.

Third, although Commerce claims that the Section A Questionnaire is required to qualify for a separate rate, Commerce

concedes that its "determinations do not specifically state that Section As are required in all future cases, but reflect the standard presumption that the PRC rate will apply unless a party presents sufficient <u>evidence</u> to rebut that presumption." Def.'s Supp. at 10. In fact, the determinations cited by Commerce have little information on how foreign owned companies qualify for separate rates. This is problematic for Commerce's argument, especially because "no separate rate analysis is required for these exporters." <u>Bicycles</u>, 61 Fed. Reg. at 19,027. Furthermore, Commerce has relied upon information other than Section A Questionnaires to determine which parties qualify for separate rates. <u>See, e.g.</u>, <u>Garlic</u>, 67 Fed. Reg. at 51,823 (Dep't Commerce Aug. 9, 2002) ("<u>Garlic</u>")(relying, in large measure, on a Q&V questionnaire to determine separate rate status); <u>Saccharin From the People's Republic of China</u>, 67 Fed. Reg. 79,049, 79,050 (Dep't Commerce Dec. 27, 2002) (referring to a company's, Kaifeng's, response to its Section A Questionnaire as "unsolicited"); <u>Apple Juice</u>, 64 Fed. Reg. at 65,676 (relying on a "questionnaire concerning quantity and value of sales of [apple juice], and company structure, ownership, and affiliations ('separate rates questionnaire[.]')"); cf. <u>Petroleum Wax Candles From the People's Republic of China</u>, 68 Fed. Reg. 53,109, 53,109 (Sept. 9, 2003) (notice of preliminary partial rescission of antidumping administrative review) ("<u>Wax Candles</u>") (requiring both Section A

and Q&V questionnaire responses to be eligible for a separate rate); Windshields, 66 Fed. Reg. at 48,235 (faulting parties for failing to respond to Commerce's quantity and volume questionnaire in deeming them nonresponsive and granting a Canadian company a separate rate because "it has provided information indicating that its PRC supplier does not have knowledge that its sales to TCGI are destined for the United States.").[19]

In fact, in Garlic, it appears that Commerce found that a Hong Kong company qualified for a separate rate on the sole basis of its mailing address even though the party had failed to respond to Commerce's questionnaire. Garlic, 67 Fed. Reg. at 51,823; Decision Memo, P.R. Doc. 1763, Pl.'s Ex. 14 at 2.[20] Indeed,

_____

[19]In Wax Candles, it is unclear what method of notice Commerce used to inform interested parties of the Section A Questionnaire. The determination makes explicit that it provided individual notice of its Q&V Questionnaire to parties listed in the notice of initiation. Wax Candles, 68 Fed. Reg. at 53,109.

[20]Commerce and Defendant-Intervenor attempt to distinguish Garlic. They argue that Commerce in Garlic applied the PRC-wide rate to Hong Kong companies who failed to respond to Commerce's questionnaire.

Commerce appears to employ a two-prong test in assigning a separate rate. First, Commerce determines whether an interested party is state-controlled. If Commerce finds that an interested party is not state-controlled, Commerce then must decide what its rate should be. See Transcom II, 294 F.3d at 1382.

Applying this approach in Garlic, Commerce first found that non-responsive companies with Hong Kong mailing addresses qualified for a separate rate. Garlic, 67 Fed. Reg. at 51,823 ("Wo Hing (H.K.) Trading Co. (Wo Hing) has an address in Hong Kong and did not respond to our January 8, 2002, request for information. Without any information concerning its corporate ownership, we presume that it is a Hong Kong entity. Thus, we determine that it qualifies for a company-specific rate."); see

(footnote continued)

Commerce has maintained throughout these proceedings that its practice is "discretionary." Def.'s Supp. at 6. Accordingly, there is no reason to conclude that Decca should have known of the Section A requirement during the stage of the investigation at issue here.

**D.**

Finally, Defendant-Intervenor and Commerce, to a lesser extent, argue that Decca was required to make inquiries of Commerce's procedures if it did not know what was required of it. Specifically, Defendant-Intervenor cites to the <u>Notice of Initiation</u> which provides contact information for inquires relating to the investigation. Therefore, the Defendant-Intervenor asserts

---

also <u>id.</u> at 51,825. Next, Commerce had to choose a rate. Because "[t]he only rate that has ever been assigned in this proceeding is 376.67 percent . . . we preliminarily determine that the rate of 376.67 percent should be used as the adverse facts available for the preliminary results of review for Golden Light, Phil-Sino, and Wo Hing." <u>Id.</u> According to the approach in <u>Garlic</u>, Commerce should have found that Decca qualified for a separate rate and then decided what the rate should have been. In this case, Commerce did not do this. Of, and to the extent, Commerce attempts to equate its presumption of state-control with an adverse facts determination, the court must note that this Court has repeatedly held "that a party must be given a reasonable opportunity to respond to Commerce's requests." <u>Shandong Huarong Mach. Co. v. United States</u>, 29 CIT ___, Slip Op 05-54, at 8 (May 2, 2005).

That this was a preliminary determination is irrelevant as the final determination incorporated by reference this finding. <u>Fresh Garlic from the People's Republic of China</u>, 68 Fed. Reg. 4,758, 4,758-59 (Dep't Commerce Jan. 30, 2003) (final results of antidumping duty administrative review and rescission of administrative review in part) ("We have not received any information since the issuance of the Preliminary Results that provides a basis for reconsideration of these determinations.").

that Decca was required to inquire of Commerce's procedures in order to later complain of a procedural irregularity. This argument is problematic.

First, this analysis implies that Commerce may ignore its own procedural rules, and, so as long as a party does not make an inquiry, that party cannot later complain of procedural defects. This result would only create perverse incentives for Commerce and run counter to basic notions of due process, i.e., that agencies must follow their rules. Moreover, such an approach would also require parties to persistently inquire of Commerce regarding its procedures lest Commerce change its procedures mid-investigation or depart from its regulations, and the party be without recourse because it failed to inquire. Commerce could not possibly want this result. Cf. Az. Grocery v. Atchison, Topeka & Santa Fe Ry. Co., 284 U.S. 370, 389-90 (1931); John F. Manning, *Constitutional Structure and Judicial Deference to Agency Interpretations of Agency Rules*, 96 COLUM. L. REV. 612, 665-68, 678-80 (1996).

Second, this requirement is counter to federal policy. The Freedom of Information Act ("FOIA") requires the publication of agency rules of procedure in the Federal Register. 5 U.S.C. § 552(a)(1).[21] Those rules must be separately stated, i.e., not part

_____

[21]Although Commerce may claim exemption from certain generally applicable administrative laws, 19 U.S.C. § 1677c (exempting "hearings" from the requirements of the Administrative Procedure Act), there is no indication that Commerce has an exemption from the FOIA requirements that Commerce promulgate or
                                                        (footnote continued)

of determinations.  Id.  Under the FOIA, "[e]xcept to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published."  Id. (emphasis added). Requiring parties to resort (unless explicitly directed) to contacting Commerce would violate the express terms of the Act. Although Decca may not have been as diligent as Defendant-Intervenor claims it should have been, Commerce has failed to comply with (or publish) notice of its rules in the Federal Register.  In weighing who should bear liability as between an agency or an interested party in such a situation, Congress has determined that the agency must bear liability.  Cf. Morton v. Ruiz, 415 U.S. 199, 232 (1974) ("The Administrative Procedure Act was adopted to provide, inter alia, that administrative policies affecting individual rights and obligations be promulgated pursuant

---

publish it rules and procedures.  See Hoenig Plywood Corp. v. United States, 51 Cust. Ct. 336, 347 (1963).  This is especially true when Commerce expects parties to come forward to challenge a presumption on their own initiative in a specific manner and at a specific time.  Even if the FOIA is not directly binding upon Commerce, is does evidence the reasonably feasible and customary alternatives.  Goldhofer Fahrzeugrwerk GmbH & Co. v. United States, 885 F.2d 858, 860 (Fed. Cir. 1989).  Contrary to Decca's claim, however, any effort Commerce has made to rectify its failure to publish such a rule, since its determination in this case, by itself, is not relevant.  See Dusenbery, 534 U.S. at 172.  However, the court does note for the sake of posterity that Commerce has now published a protocol: Separate Rates and Combination Rates in Antidumping Investigations Involving Non-Market Economy Countries, 70 Fed. Reg. 17,233 (Dep't Commerce Apr. 5, 2005).

to certain stated procedures so as to avoid the inherently arbitrary nature of unpublished ad hoc determinations."). Accordingly, Defendant-Intervenor's argument must fail.

Third, requiring Decca to inquire would also be counter to the Supreme Court's holding in New York v. New York, N. H. & H. R. Co., 344 U.S. 293, 296 (1953). In that case, New York City complained that its liens on certain properties were improperly destroyed in a Federal bankruptcy proceeding. The governing statute required the bankruptcy judge to provide "reasonable notice" of any filing deadlines. Although the bankruptcy court alerted some parties by direct mail of the deadline, it informed other known parties, including New York City, through publication in newspapers. New York, unaware of the filing deadlines, missed its opportunity to protect its liens. Although New York City had actual knowledge of the bankruptcy proceedings, the Court held:

> Nor can the bar order against New York be sustained because of the city's knowledge that reorganization of the railroad was taking place in the court. The argument is that such knowledge puts a duty on creditors to inquire for themselves about possible court orders limiting the time for filing claims. But even creditors who have knowledge of a reorganization have a right to assume that the statutory "reasonable notice" will be given them before their claims are forever barred. When the judge ordered notice by mail to be given the appearing creditors, New York City acted reasonably in waiting to receive the same treatment.

Id. at 297. In this case, not only did Commerce mail the Q&V Questionnaires directly to the parties, Commerce was required to do more than provide "reasonable notice" – it was required to send

written requests _to_ the parties.  Accordingly, it was certainly not inappropriate for Decca to rely on Commerce to follow its published rules of procedure.  Cf.  Transcom, Inc. v. United States, 24 CIT 1333, 1343, 123 F. Supp. 2d 1372, 1381 (2000) ("Indeed, it would be anomalous to expect a member of the industry to inquire whether the agency is aware of the applicable statutes, regulations and pertinent case law, or whether the agency actually meant to make the unambiguous statement it made.").  That the statute in New York, N. H. & H. R. R. Co. required "reasonable notice," as opposed to Commerce's regulation in this case, is of no consequence.  As courts have long held, "[i]t is well established that there is a presumption that public officers perform their duties correctly, fairly, in good faith, and in accordance with law and governing regulations[.]"  Parsons v. United States, 670 F.2d 164, 166 (Cl. Ct. 1982) (emphasis added), Transcom I, 182 F.3d at 882; Satellite Broad. Co. v. FCC, 824 F.2d 1, 3-4 (D.C. Cir. 1987); see also infra at note 11.[22]

Last, in this case, Commerce imposed a February 23, 2004 deadline for all Section A Questionnaires.  This deadline was well in advance of the deadline for the completion of the preliminary

---

[22]Nor does this court's decision in Cathedral Candle, 27 CIT ___, 285 F. Supp. 2d 1371, 1378 (2003), counsel anything to the contrary.  In that case, the "Defendants were not required by either [the governing statute] or any other law to personally notify [affected parties] of the [law] and its effects."  Id.  In contrast, in this case, Commerce's regulations required it to provide notice to each interested party.

investigation and before Commerce even sent its rejection letter to Decca regarding Decca's Q&V Questionnaire submission. Therefore, no reason existed why, in February, Decca should have felt it was necessary to inquire of Commerce regarding Commerce's procedures. Moreover, this argument misses a crucial purpose of Section 351.301(c)(2)(ii) other than providing notice of the deadlines and required forms: to inform parties of the consequences for their failure to proffer the sought after information.

                    *                    *                    *

The court appreciates the difficulty Commerce faces in identifying, and corresponding with, companies in non-market economies. But these difficulties do not justify Commerce's decision to reject Decca's submissions in the posture of this case. First, Commerce cannot claim that it could not locate Decca; Commerce did have Decca's contact information on file before it sent the Section A Questionnaires. Cf. Dusenbery, 534 U.S. at 177 (Ginsburg, J. dissenting) (citing cases); Schroeder v. City of New York, 371 U.S. 208, 212-13 (1962) ("The general rule that emerges from the Mullane case is that notice by publication is not enough with respect to a person whose name and address are known or very easily ascertainable and whose legally protected interests are directly affected by the proceedings in question."). Second, Commerce has voluntarily assumed the obligation to send questionnaires to all interested parties. Cf. Transcom I, 182 F.3d

at 882-83 (holding that due process, by itself, does not require Commerce to provide notice to every party so long as Commerce follows its clearly stated rules on where and when it will provide notice); Goldhofer, 885 F.2d at 860 (same). As an alternative, Commerce could have established deadlines, and identified the requisite submissions, through publication in the Federal Register. The publication of precise deadlines would limit Commerce's flexibility; however, Commerce would also not be required to send individual notice. In choosing to provide individual notice, Commerce has traded convenience for flexibility -- it must take the bitter with the sweet in this trade-off. Third, interested parties are not divested entirely of responsibility should an error in transmitting a questionnaire occur. As the court held in Transcom II, a party must submit something before the close of the investigation to secure its right to complain of a procedural irregularity. Transcom II, 294 F.3d at 1379-80. This rule provides the necessary safety valve so that Commerce can make a final conclusive determination without being perpetually bombarded by new parties claiming that they were not properly noticed of procedural requirements, while, at the same time, recognizing the interests of parties to be informed of the procedural rules. Fourth, as a balance of equities, Commerce has not maintained that it would be unreasonable, or unfair, to require it to consider Decca's evidence in light of the circumstances of this case. Memo from Holly Kuga, Acting Deputy Assistant Sec'y, Group II, Imp.

Admin., to Troy H. Cribb, Acting Assistant Sec'y for Imp. Admin., Re: <u>Issues and Decision Memorandum for the Sixth Administrative Review of Steel Wire Rope from Korea</u>, (Aug. 7 2000) <u>available at</u> http://ia.ita.doc.gov/frn/summary/korea-south/00-20556-1.txt (because of available personnel at Commerce, allowing respondent an opportunity to submit an untimely questionnaire response when the party had changed address and therefore had not received the questionnaire).

**CONCLUSION**

For the foregoing reasons the court remands this case to Commerce for reconsideration consistent with this decision. In its remand determination Commerce may reopen the record and may find a) that Decca received actual and timely notice of the Section A Questionnaire requirement, b) that the evidence Decca presented does not satisfy the evidentiary requirements for a separate rate, or c) that Decca is entitled to a separate rate. Commerce shall have until October 21, 2005 to issue a remand determination. Parties' comments shall be due by November 7, 2005. Rebuttal comments shall be due by November 21, 2005.

IT IS SO ORDERED.

_____/s/_____
Donald C. Pogue
Judge

Dated:    August 23, 2005
          New York, New York