Slip Op. 06-43

UNITED STATES COURT OF INTERNATIONAL TRADE

```
- - - - - - - - - - - - - - - - -x
                                 :
DECCA HOSPITALITY FURNISHINGS,   :
LLC,                             :
             Plaintiff,          :
                                 :
MARIA YEE INC.,                  :
                                 :
    Plaintiff-Intervenor,        :   Before: Pogue, Judge
                                 :   Court No. 05-00002
             v.                  :
                                 :
UNITED STATES,                   :
                                 :
             Defendant,          :
                                 :
AMERICAN FURNITURE               :
MANUFACTURERS COMMITTEE FOR      :
FAIR TRADE,                      :
                                 :
    Defendant-Intervenor.        :
- - - - - - - - - - - - - - - - -x
```

[Writ of mandamus granted]

OPINION

POGUE, Judge: Responding to the court's opinion in <u>Decca Hospitality Furnishings, LLC v. United States</u>, 29 CIT __, 391 F. Supp. 2d 1298 (2005) ("<u>Decca I</u>"), Commerce determined on remand that Plaintiff, Decca Hospitality Furnishings, LLC ("Decca"), was entitled to a 6.65% cash deposit rate instead of the 198.08% "PRC-wide" rate assigned to Decca in Commerce's original determination. After remand, on December 20, 2005, the court entered judgment affirming Commerce's remand determination. Decca now moves the court to enforce the judgment entered after remand and, by

consequence of enforcing that judgment, to order Commerce to correct Decca's cash deposit rate to reflect Commerce's Remand Determination; alternatively, Decca asks the court to issue a writ of mandamus compelling Commerce to implement the lawful cash deposit rate.  For the reasons set forth below, the court grants Plaintiff's alternative request for mandamus relief.

**BACKGROUND**
**A.**

Under the antidumping statute ("the Statute"), 19 U.S.C. §§ 1673a (2000) <u>et seq.</u>, Commerce is charged with investigating allegations of dumping by foreign producers or importers, and, if dumping is found, to counter the effects of such dumping by ordering a duty on dumped imports, i.e., an antidumping duty.[1]  In the course of an investigation, Commerce may, at different times, estimate the rate of antidumping duty that will ultimately be assessed.  The initial estimate follows an affirmative preliminary determination that dumping has occurred.  19 U.S.C. § 1673b(d).  Pursuant to this initial estimate, Commerce instructs the Bureau of Customs and Border Protection ("Customs") to collect estimated duties, sometimes referred to as "cash deposits," on entries of the merchandise that is subject to investigation.  19 U.S.C. §

---

[1]     For a more thorough discussion of the administrative process see <u>Tex. Crushed Stone Co. v. United States</u>, 35 F.3d 1535, 1536-37 (Fed. Cir. 1994); <u>Am. Lamb Co. v. United States</u>, 785 F.2d 994, 998-99 (Fed. Cir. 1986).

1673b(d)(1)(B).  See also 19 C.F.R. § 351.205; Torrington Co. v.
United States, 44 F.3d 1572, 1577-78 (Fed. Cir. 1995);  Mitsubishi
Elecs. Am., Inc. v. United States, 44 F.3d 973, 976-77 (Fed. Cir.
1994).[2]  After Commerce completes its investigation, it issues a
final determination which may (and usually does) adjust Commerce's
initial estimate.   19 U.S.C. § 1673d(c)(1)(B)(ii); see also 19
U.S.C. §§ 1673e(a)(3), 1673e(c)(3); Cambridge Lee Indus. v. United
States, 916 F.2d 1578, 1579 (Fed. Cir. 1990).   This final
determination is implemented in the antidumping duty order.  See
Am. Lamb Co., 785 F.2d at 999.

As mentioned, the cash deposit rate is merely an estimate of
the eventual liability importers subject to an antidumping duty
order will bear.  Because the rate established by the final
determination is based on past conduct, i.e., conduct occurring
before the final determination, interested parties to an
antidumping duty proceeding may ask Commerce to annually review the
antidumping duty order in light of an importer's current practices.
See 19 U.S.C. § 1675; Asociacion Colombiana de Exportadores de
Flores v. United States, 903 F.2d 1555, 1559 (Fed. Cir. 1990);
Floral Trade Council of Davis, Cal. v. United States, 888 F.2d
1366, 1369 (Fed. Cir. 1989). The process of review, called an
"administrative review," establishes the actual liability the

_____

[2]    Commerce also requires that "liquidation" be suspended.
See infra at pp. 5-6.

importer bears.  19 C.F.R. § 351.213.[3]

If no review is requested, the rate found in the final determination is the rate at which liability is assessed.  See Consol. Bearings Co. v. United States, 412 F.3d 1266, 1270-71 (Fed. Cir. 2005); Kemira Fibres Oy v. United States, 61 F.3d 866, 868-69 (Fed. Cir. 1995); Cambridge Lee Indus., 916 F.2d at 1579.  However, if a review is requested, Commerce determines what, if any, dumping has actually occurred for goods entered for a certain time (the "period of review").  See Torrington Co., 44 F.3d at 1577-79; 19 C.F.R. § 351.213.

If the administrative review finds that the final determination understated the level of dumping, the importer must pay, in addition to the cash deposits already collected, the difference between the results of the administrative review and the

---

[3]     "In an administrative review, Commerce recalculates the relevant variables to determine whether a foreign company is continuing the practice of dumping, i.e., selling its merchandise in the United States for less than a foreign like product in its home market."  NTN Bearing Corp. v. United States, 295 F.3d 1263, 1266 (Fed. Cir. 2002); Torrington Co., 44 F.3d at 1578 ("The administrative review effectively updates the antidumping duty order.").  Without administrative reviews, importers bent on dumping would be free to dump at rates above the final determination; at the same time, importers that wish to bring their conduct within bounds of U.S. dumping laws would have no incentive to stop dumping.  See also 19 C.F.R. § 351.212 ("Unlike the systems of some other countries, the United States uses a 'retrospective' assessment system under which final liability for antidumping and countervailing duties is determined after merchandise is imported.")

results of the final determination, plus interest.  19 U.S.C. §§ 1673f(b)(1), 1677g; see also  Torrington Co., 44 F.3d at 1578-79. However, if the administrative review reveals that the importer owes less than what Customs holds in cash deposits, Customs must refund this difference plus interest.  19 U.S.C. § 1673f(b)(2). The administrative review also determines the cash deposit rate to be applied until the next administrative review.  See 19 U.S.C. § 1675(a)(2)(C); Allegheny Ludlum Corp. v. United States, 346 F.3d 1368, 1372-73 (Fed. Cir. 2002); Zenith Elecs. Corp. v. United States, 884 F.2d 556, 558 (Fed. Cir. 1989).

Once the actual rate of dumping for particular goods is established through an administrative review, Commerce instructs Customs to collect the required duties, or refund any monies owed, for the goods imported during that period.  "Liquidation," which is the final assessment and collection of duties,[4] see Olympia Indus., Inc. v. United States, 30 CIT ___, __ Slip. Op. 06-04, 6 n.1 (Jan. 6, 2006) (citing C.F.R. § 159.1 (2000); Ammex, Inc. v. United States, 419 F.3d 1342, 1345 n.1 (Fed. Cir. 2005)), occurs only once for each entry of goods, and, for the most part, may not be subsequently undone, see Cambridge Lee Indus., 916 F.2d at 1579

---

[4]   As noted, while it is Customs that collects duties at liquidation, it is Commerce that instructs Customs as to the proper rate of duty whether the rate of duty is a rate to be used for cash deposits or a rate to be used for liquidation.

(Fed. Cir. 1990) ("Once an entry has been liquidated, the duties paid cannot be recovered even if the payor subsequently prevails in its challenge to the antidumping order."); Zenith Radio Corp. v. United States, 710 F.2d 806, 810 (Fed. Cir. 1983) ("Zenith").

Because liquidation may not, in most cases, be subsequently undone, it is "suspended" until such time as a party may request an administrative review, and during the pendency of any such review. See 19 U.S.C. § 1673b(d)(2); 19 C.F.R. § 351.211(b)(3). See also Micron Tech. Inc. v. United States, 117 F.3d 1386, 1391 (Fed. Cir. 1997). Additionally, this court may also enjoin liquidation during the pendency of court proceedings. See, e.g., Yancheng Baolong Biochemical Prods. Co. v. United States, 406 F.3d 1377, 1381-82 (Fed. Cir. 2005); Timken Co. v. United States, 893 F.2d 337, 338-41 (Fed. Cir. 1990); Zenith, 710 F.2d at 810-12; see also 19 U.S.C. § 1516a(c)(1)&(2). From this brief survey it is apparent that there are real differences between the cash deposit rate and the liquidation rate.[5]

**B.**

On December 17, 2003, Commerce initiated an investigation of wooden bedroom furniture exporters/producers from the People's

---

[5]    For example, a cash deposit rate is an interim or provisional rate, but a liquidation rate has no effect until it is finally assessed, and a cash deposit rate may be modified during the period while liquidation is suspended, whereas a liquidation rate cannot normally be changed because liquidation occurs only once for each entry.

Republic of China ("PRC").  See <u>Wooden Bedroom Furniture from the
People's Republic of China</u>, 68 Fed. Reg. 70,228 (Dept. Comm. Dec.
18, 2003) (notice of initiation).  In its investigation, Commerce
rejected as untimely certain information submitted by Decca to
prove its independence from state-control.[6]  <u>Wooden Bedroom
Furniture from the People's Republic of China</u>, 69 Fed. Reg. 67,313,
67,313 (Dep't Commerce Nov. 17, 2004) (notice of final
determination of sales at less than fair value) ("<u>Final
Determination</u>") <u>as amended</u>, <u>Wooden Bedroom Furniture from the
People's Republic of China</u>, 70 Fed. Reg. 329 (Dept. Commerce Jan.
4, 2005) (notice of amended final determination of sales at less
than fair value and antidumping duty order) ("<u>Amended Final
Determination</u>").  As a consequence of its decision to reject
Decca's evidence as untimely, Commerce assigned Decca the rate it
assigned to all importers who did not establish independence from
state-control, i.e., the "PRC-wide" rate of 198.08%.  <u>Final
Determination</u>, 69 Fed. Reg. at 67,317.  Pursuant to this
assignment, Commerce instructed Customs to collect cash deposits
from Decca at a rate of 198.08%.  <u>Amended Final Determination</u>, 70
Fed. Reg. at 329.

As permitted under the Statute, 19 U.S.C. § 1516a, in this

---

[6]     Because the PRC is a non-market economy ("NME"), in
investigations of PRC exporters/producers, Commerce presumes that
all companies operating in the PRC are state-controlled until those
companies demonstrate independence from government control.

court, Decca sought review of Commerce's <u>Final Determination</u>, asserting that Commerce had failed to notify Decca (a) that it had requested information from Decca and (b) of the deadline by which Decca was required to respond to the information request. <u>See</u> <u>Decca I</u>, 29 CIT at __, 391 F. Supp. 2d at 1303. Because Commerce had failed to adequately provide notice of such requirements to Decca, Decca averred that Commerce had improperly rejected the evidence Decca submitted; Decca further argued that because Commerce's rejection of its evidence was improper, and because this evidence demonstrated that Decca was not in fact state-controlled, Decca was entitled to the "separate" rate of 6.65%, i.e., the rate Commerce assigned all non-mandatory respondents who are independent of PRC control, and that application of the 198.08% PRC-wide rate to Decca was unlawful. <u>Id.</u> at 1303-04. This court agreed, in part, finding that Commerce failed to follow its regulations in notifying interested parties of the information requested of them and the deadline for submitting such information. <u>Id.</u> at 1316-17 In so holding, the court remanded the case to Commerce to consider whether, despite the fact that Commerce had not followed its regulations, Decca had nevertheless received actual and timely notice of the relevant submissions and deadlines. <u>Id.</u> In the event Commerce could not establish that Decca had received notice of the submission requirements, the court ordered Commerce to determine whether Decca was entitled to a separate rate. <u>Id.</u> On

remand, Commerce found that it was not feasible for it to demonstrate that Decca had received notice of the requested information and the relevant deadline for submitting such information.  See Wooden Bedroom Furniture from the People's Republic of China, 71 Fed. Reg. 1,511 (Dep't Commerce Jan. 10, 2006) (notice of court decision not in harmony) ("Notice of Court Decision").  Commerce further found, after considering Decca's factual filings, that Decca was entitled to the 6.65% separate rate.  Id.

During the remand proceedings, Decca requested that Commerce amend its instructions to Customs with respect to Decca's cash deposit rate.  Despite its remand determination that Decca was entitled to the separate 6.65% rate, Commerce, invoking 19 U.S.C. § 1516a(e),[7] concluded that it was without authority to instruct Customs to apply the separate 6.65% rate as Decca's cash deposit rate until a final and conclusive court decision.  Final Results of Redetermination Pursuant to Court Remand at 8-9 (Dept. Commerce Nov. 7, 2005) ("Remand Redetermination").  Rather, Commerce has left in place its original instructions that Customs apply to Decca the PRC-wide, 198.08% rate, application of which to Decca has been found to be unlawful by this court.  Specifically, in the remand determination, Commerce stated that "in accordance with [its]

_____

[7]    19 U.S.C. § 1516a(e) speaks to liquidation.  See infra at pp. 28-33.

normal practice" it does "not intend to issue amended customs instructions . . . until after it has published an amended final determination."  <u>Remand Redetermination</u> at 8-9.  Commerce further noted that it "will publish an amended final determination once the decision from the Court is final and conclusive."[8]  <u>Id.</u>

In Decca's comments on Commerce's remand determination, submitted pursuant to this court's opinion and order in  <u>Decca I</u>, 29 CIT at  __, 391 F. Supp. 2d at 1317, Decca asked the court to enforce its judgment and thereby order Commerce to amend Decca's cash deposit rates.  After considering the parties' comments, and after consultation therewith, the court affirmed Commerce's remand determination with the understanding that Decca could renew its request to enforce the court's judgment after the automatic stay for enforcing the court's judgment expired pursuant to USCIT R. 62(a).[9]  <u>Decca Hospitality Furnishings, LLC v. United States</u>, 29 CIT ___, Slip Op. 05-161 (Dec. 20, 2005).

After the court's action, on January 10, 2006, Commerce published a Federal Register Notice announcing that the court had

_____

[8]    Commerce cites <u>Timken</u> 893 F. 2d at 340 n. 6 to support its position.  Footnote 6 reads, in part, "We do, however, agree that a decision must be 'final' in the sense that the CIT has entered final judgment in order to require publication of notice under § 1516a(c)(1) and (e)."

[9]    Rule 62 provides, in relevant part, "[e]xcept as stated herein or as otherwise ordered by the court, no execution shall issue upon a judgment nor shall proceedings be taken for its enforcement until the expiration of 30 days after its entry."

entered judgment in Decca's favor.  Notice of Court Decision, 71 Fed. Reg. at 1,511.

Although Commerce declined to appeal this court's decision, the Court of Appeals for the Federal Circuit ("Federal Circuit"), on February 23, 2006,  docketed an appeal filed by Defendant-Intervenor.  Accordingly, pursuant its notice in the Federal Register, Commerce will not amend Decca's cash deposit rate, if at all, until the Federal Circuit issues a final and conclusive decision.

Additionally, on January 3, 2006, Commerce published a notice providing interested parties to the investigation an opportunity to request an administrative review.  Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation, 71 Fed. Reg. 89 (Jan. 3, 2006) (notice of opportunity to request administrative review of antidumping or countervailing duty order, finding, or suspended investigation).  "[W]ell over 100 companies," including Decca and Defendant-Intervenor, have submitted requests for an administrative review.  Def.'s Resp. Pl.'s Mot. Enforcement of J. at 4.  According to Commerce, Decca is entitled to prove its entitlement to a separate rate during the administrative review. Commerce has further represented to the court that should Decca submit, in the administrative review, the same evidence Decca submitted during the remand proceedings, Decca would receive a separate rate in the administrative review.

No party disputes that if Decca does establish its entitlement to a separate rate, Decca will receive a refund, plus interest, of any cash deposit tendered on goods imported during the period of review that exceeds the separate rate as determined by the administrative review.  This refund would include all duties that Decca will pay until a final and conclusive court decision has issued.[10]

Decca has maintained to the court that it has attempted to secure credit with which to post a cash deposit, but has been unable to do so because of the extraordinary level of the cash deposit rate Customs currently requires.  See Def.'s Report Re. Availability of a Bond.  Decca claims that because of its current cash deposit rate of 198.08%, and its inability to obtain credit to cover the cash deposit rate, it cannot import goods that are subject to the antidumping duty order into the United States. Therefore, Decca contends, its subject merchandise is effectively excluded from the U.S. market until Commerce amends Decca's cash deposit rate to reflect the court's judgment.  Consequently, unless the court directs Commerce to amend Decca's cash deposit rate, according to Decca, Decca is blocked from the U.S. market until a final and conclusive court decision issues.

---

[10]     Indeed, it appears that the only chance Decca would not receive a separate rate is if Decca misses the filing deadline. The bigger uncertainty is what the separate rate will be.  At this point of time, based on Commerce's Final Determination, the best estimate is that that rate will be around 6.65%.

### DISCUSSION

Under the Statute, Commerce's authority and obligation to issue instructions to Customs is a purely ministerial act, to which Decca may be entitled by virtue of Commerce's remand determination. See 19 U.S.C. § 1673e(a)(1).  After all, this court has determined that application of the 198.08% rate is unlawful.  Moreover, Decca claims, there is no rate that can be lawfully applied other than the 6.65% rate.[11]  Nonetheless, because Decca's prayer for relief requires the court to take the specific step of ordering Commerce to instruct Customs to lower Decca's cash deposit rate to 6.65%, the court will construe Decca's request as requesting mandamus or injunctive relief in addition to enforcing the court's judgment. Accordingly, it is Decca's request for an order granting this additional relief from Commerce's erroneous cash deposit rate that is at issue here.

---

[11]    As noted above, despite its remand determination that Decca was entitled to the separate 6.65% rate, Commerce, relying on 19 U.S.C. § 1516a(e), concluded that it was without authority to instruct Customs to apply the 6.65% rate as Decca's cash deposit rate until a final and conclusive court decision is issued addressing Defendant-Intervenor's appeal.  While the court need not decide this issue because the court's issuance of judgment establishes Commerce's duty, the court notes that Commerce's own remand determination, as a matter of law, replaces Commerce's original, final determination; the statute governing antidumping duty orders that are required to follow from such determinations, 19 U.S.C. § 1673e(a)(1), specifically provides that Commerce shall publish an order which "directs customs to assess an antidumping duty" in the amount calculated and "requires the deposit of estimated antidumping duties . . . ." Commerce fails to offer any good reason why 19 U.S.C. § 1673e(a)(1) does not apply to Commerce's remand determination.

The common-law writ of mandamus, as codified in 28 U. S. C. §§ 1361, 1651(a),[12]  is a "drastic [remedy], to be invoked only in extraordinary situations."  Allied Chem. Corp. v. Daiflon, Inc., 449 U.S. 33, 34 (1980).  Because a writ of mandamus is "'one of the most potent weapons in the judicial arsenal,'" Cheney v. U.S. Dist. Court for D.C., 542 U.S. 367, 380 (2004) (quoting Kerr v. U.S. Dist. Court for the N. Dist. of Cal., 426 U.S. 394, 403 (1976)), before such a writ may issue, a party seeking the writ must satisfy three requirements.  First, "'the party seeking issuance of the writ [must] have no other adequate means to attain the relief he [or she] desires.'"  Id. (quoting Kerr, 426 U.S. at 403 (1976)).  Second, the "petitioner must satisfy 'the burden of showing that [his or her] right to issuance of the writ is clear and

---

[12]    Pursuant to 28 U.S.C. § 1585, "[t]he Court of International Trade, shall possess all the powers in law and equity of, or as conferred by statute upon, a district court of the United States."  See also 28 U.S.C. § 2643(c)(1).  As is relevant here, the district courts have authority to grant writs of mandamus (perhaps more appropriately termed mandamus-like relief in accordance with Fed. R. Civ. Pro. 81(b)) under 28 U.S.C. §§ 1361 & 1651(a).  See 28 U.S.C. § 1361 ("The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.");  28 U.S.C. §1651(a) ("The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.").
         This court's jurisdiction over Plaintiff's request for mandamus is not dispossessed by Defendant-Intervenor's notice of appeal.  On the contrary, Fed. R. App. P.8(a)(1) provides for the submission of requests for such injunctive relief, which includes mandamus, in the first instance, to be made to the district court.

indisputable,'" Cheney, 542 U.S. at 381 (quoting Kerr, 426 U.S. at 403), i.e., that the defendant owes him or her a "clear nondiscretionary duty," Heckler v. Ringer, 466 U.S. 602, 616 (1984).  See also United States ex rel. McLennan v. Wilbur, 283 U.S. 414, 420 (1931) ("[The writ of mandamus] will issue only where the duty to be performed is ministerial and the obligation to act peremptory, and plainly defined.  The law must not only authorize the demanded action, but require it; the duty must be clear and indisputable."); Roberts v. United States, 176 U.S. 221, 231 (1900) ("Every statute to some extent requires construction by the public officer whose duties may be defined therein. . . . But that does not necessarily . . . make the duty of the officer anything other than a purely ministerial one."); 13th Regional Corp. v. U.S. Dep't of Interior, 654 F.2d 758, 760 (D.C. Cir. 1980).  Third, "even if the first two prerequisites have been met, the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances."  Cheney, 542 U.S. at 381 (citing Kerr, 426 U.S. at 403 ("Moreover, it is important to remember that issuance of the writ is in large part a matter of discretion with the court to which the petition is addressed.")).  See also Duncan Townsite Co. v. Lane, 245 U.S. 308, 312 (1917) ("although classed as a legal remedy, [the] issuance [of a writ of

mandamus] is largely controlled by equitable principles.").[13]   The

court will address each requirement in turn.


**(A) Availability of Adequate Alternative Remedies**[14]

In order for a writ of mandamus to issue, a complaining party

must demonstrate that he or she does not have adequate alternative

---

[13]   In <u>Cheney</u>, the Supreme Court noted that a "District Court's analysis of whether mandamus relief is appropriate should itself be constrained by principles similar to those" outlined above.  <u>Cheney</u>, 342 U.S. at 390-91.  This iteration of the test, therefore, must replace the Federal Circuit's prior articulation of this test.  <u>See</u>, <u>e.g.</u>, <u>Timken</u>, 893 F.2d at 339.  Because the court in <u>Cheney</u> was considering a writ of mandamus as against a district court judge – thereby implicating the final judgment rule and other like considerations -- the principles underlying issuance of mandamus here are more generous than as articulated above.

[14]   Defendant-Intervenor argues: "Decca seeks to circumvent the requirement that it demonstrate that it is irreparably harmed by the application of the cash deposit rate determined in the investigation until a final and conclusive decision in this appeal."  <u>Def.-Int.'s Resp. Pl.'s Application Writ of Mandamus</u> at 7.  This argument has already been <u>squarely</u> rejected by the Federal Circuit.  As the court held in <u>Timken</u>, 893 F.2d at 342:

> As a final matter, the third element of a mandamus action, the lack of an adequate alternative remedy, was met in this case. Commerce suggests that as an alternative remedy, Timken could have sought an injunction pursuant to 19 U.S.C. § 1516a(c)(2). We do not, however, consider such an alternative remedy to be adequate, since Timken would be required to prove that an injunction was appropriate under the circumstances. <u>Zenith Radio Corp. v. United States</u>, 710 F.2d 806 (Fed. Cir. 1983).  Timken should not be required to present such proof, since it already has a clear statutory right to the claimed relief.

Nor, as the court held in <u>Timken</u>, is Decca required to demonstrate irreparable harm as Defendant-Intervenor argues. <u>Id.</u> at 339.

means to obtain relief.  Defendants claim that Decca does have an alternative means to obtain relief.[15]  Specifically, Defendants argue that, at the time of liquidation, Decca will receive a refund for an overpayment of cash deposits it makes.  Therefore, so the argument goes, liquidation provides an adequate alternative remedy. Under the circumstances of this case, the court disagrees.

Normally, an aggrieved party may obtain effective relief from an erroneous cash deposit rate at the time of liquidation.  As noted above, the Statute provides for the payment of interest upon liquidation if the cash deposit rate is different than the actual dumping margin determined either by a final and conclusive court decision or an administrative review.  See 19 U.S.C. §§ 1673f(b), 1677g.  As a result, under this regime, theoretically, an importer should be no more disinclined to import goods into the United States under the threat that an appeal (or administrative review) will reinstate a prior cash deposit rate than it would if it were required to pay the original, albeit erroneous, cash deposit.  As such, in many cases, at least theoretically, there may be no reason to grant parties relief from a cash deposit rate determined to be erroneous by the court's review of Commerce's final determination because liquidation, with interest, after a final and conclusive

_____

[15]     As noted above, enforcement of the court's judgment cannot provide an adequate alternative remedy because it does not result in an order requiring Commerce to correct its instructions to Customs.

court decision, will provide relief.

Nevertheless, theory and reality are not always the same. Significantly, given the complexity of U.S. trade laws, an importer's creditors may not understand the risks involved in providing credit and, consequently, may decline to provide credit where it is otherwise efficient to so provide. Alternatively, creditors may demand a high rate of interest to cover what they perceive as a high risk investment. This may have a chilling effect on importers as they may be unable to secure the necessary credit to cover the erroneous cash deposit rate pending a final and conclusive court decision or an administrative review. Therefore, unless the court grants relief in some cases, importers may be harmed by an unlawful cash deposit rate while the matter is being reviewed. See, e.g., Queen's Flowers de Colom. v. United States, 20 CIT 1122, 1125-28, 947 F. Supp. 503, 506-07 (1996); NSK Ltd. v. United States, 19 CIT 1013, 1031-32, 896 F. Supp. 1263, 1278 (1995) ("NSK II")(remanding to Commerce to consider whether circumstances would justify refunding cash deposits prior to liquidation);[16] Chilean Nitrate Corp. v. United States, 11 CIT 538, 540 & 540 n.2 (1987).

Decca clearly falls in the latter camp. Currently, Commerce

---

[16]   Defendant-Intervenor cites NSK Ltd. v. United States, 17 CIT 500, 501 (1993), for the alternate proposition. This analysis was superceded by NSK II, 19 CIT at 1031-32, 896 F. Supp. at 1278, vacated in part NSK Ltd. v. United States, 21 CIT 1006 (1997).

requires Decca to post a 198.08% cash deposit – a rate almost thirty times that found lawful by the court (and now Commerce). Faced with such a rate, Decca has further maintained that its current cash deposit rate excludes it from the U.S. market. No party has offered any <u>evidence</u> to contest this assertion (evidence of which would be readily obtainable from Customs). <u>Cf.</u> USCIT R. 11 (denials of factual allegations must have reasonable support). Therefore, given that Decca is excluded from the market because of the application of the PRC-wide cash deposit rate, offering Decca a refund of cash deposits that it would have to pay on goods it cannot bring into the country is hardly a remedy at all.

**(B) Commerce's Duty**

Under the second requirement of mandamus, Decca must demonstrate that Commerce has a clear, rather than discretionary, duty. The question of whether Decca has asserted a clear duty on the part of the defendant turns, at least in part, on the proper construction of 19 U.S.C. § 1516a(c)(1)[17] ("Section 1516a(c)(1)");

---

[17]   Title 19 Section 1516a(c)(1) provides:

Unless such liquidation is enjoined by the court under paragraph (2) of this subsection, entries of merchandise of the character covered by a determination of the Secretary, the administering authority, or the Commission contested under subsection (a) of this section shall be liquidated in accordance with the determination of the Secretary, the administering authority, or the

(footnote continued)

therefore, the court must begin by reviewing existing authority on the interpretation of that provision.

In NTN Bearing Corp. of Am. v. United States, 13 CIT 91, 705 F. Supp. 594 (1989), plaintiff, NTN Bearing Corporation ("NTN"), challenged various decisions by Commerce before this court namely: (1) whether certain of its products were included within the scope of an antidumping duty order; (2) whether Commerce's decision was supported by substantial evidence with respect to the merchandise properly falling within the scope of the order; and (3) additional clerical errors in the computation of the duty margin of merchandise falling within the scope of the order. See NTN Bearing Corp. of Am. v. United States, 892 F.2d 1004, 1005 (Fed. Cir. 1989) ("NTN Bearing"). The parties cross-moved for partial summary judgment with regard to the first question. After granting NTN's motion for partial summary judgment, this court forbade "further collection of estimated dumping duties on [the merchandise found outside the scope of the order] and [] order[ed] return of duties previously collected on such [merchandise]." Id. On appeal, the

Commission, if they are entered, or withdrawn from warehouse, for consumption on or before the date of publication in the Federal Register by the Secretary or the administering authority of a notice of a decision of the United States Court of International Trade, or of the United States Court of Appeals for the Federal Circuit, not in harmony with that determination. Such notice of a decision shall be published within ten days from the date of the issuance of the court decision.

Federal Circuit vacated this court's injunction. Although recognizing this Court's "broad injunctive powers," the Federal Circuit held that "[a]bsent a final court decision in its favor, NTN has no right to the injunctive relief granted here." Id. at 1006.

In explaining its decision in NTN Bearing, the Federal Circuit opined:

> As was said in Melamine Chemicals, Inc. v. United States, 732 F.2d 924, 934 (Fed. Cir. 1984) (emphasis in original) "The administrative handling of the involved entries of [merchandise] can be [a]ffected only by (1) a preliminary injunction pursuant to 19 U.S.C. § 1516a(c)(2) or (2) a final court decision adjudicating the legality, vel non, of the challenged determination. 19 U.S.C. 1516[a](e)." Before a final court decision, therefore, the agency determination governs entry of merchandise. 19 U.S.C. § 1516a(c)(1)(1988).
>
> A partial summary judgment is not a final decision. Hence the trial court's instructions respecting duties constituted an improper attempt to affect the administrating handling of entries prior to any final court decision. Following an affirmative agency finding of dumping, estimated duties are to be collected pending liquidation. 19 U.S.C. § 1516(b),(f) (1988); 19 C.F.R. § 353.39(e),.48(c)(1989). Because the agency determination requiring deposit of estimated antidumping duties operates until a final court decision adverse to that of the agency, estimated duties are properly collectable from NTN.

Id. (footnotes omitted) (emphasis in original).

Thus, under the Federal Circuit's reasoning in NTN Bearing, this court can order no adjustment to a cash deposit rate prior to a "final court decision." Id. In the case at issue here, all parties (more or less) acknowledge that this language from NTN

Bearing is determinative; nonetheless, the parties disagree as to what this language means.

The disagreement stems from the fact that the phrase "final court decision" has multiple meanings. Commerce avers that "final court decision," as used in NTN Bearing, refers to a "conclusive court decision." For this proposition, Commerce cites various decisions interpreting Congress' use of the phrase "final court decision" in Section 1516a(e). See, e.g., Yancheng Baolong Biochemical Prods. Co., 406 F.3d at 1381-82 (preliminary injunction on liquidation of entries remains until a final and conclusive court decision); Fujitsu Gen. Am., Inc. v. United States, 283 F.3d 1364, 1379 (Fed. Cir. 2002) (finding that a preliminary injunction dissolves upon issuance of a final and conclusive court opinion); Hosiden Corp. v. United States, 85 F.3d 589, 591 (Fed. Cir. 1996) ("The Court of International Trade does not have discretion to require liquidation before the final decision on appeal. 19 U.S.C. § 1516a(e) requires that liquidation, once enjoined, remains suspended until there is a "conclusive court decision which decides the matter, so that subsequent entries can be liquidated in accordance with that conclusive decision." (quoting Timken, 893 F.2d at 342)); Smith Corona Corp. v. United States, 915 F.2d 683, 688 (Fed. Cir. 1990) ("suspension is not automatically lifted when the decision of the Court of International Trade is appealed to the Federal Circuit. Suspension of liquidation continues until a

'conclusive' court decision is reached, i.e., a decision that is not subject to further appeal or collateral attack.").

In opposition, Decca asserts that the phrase "final court decision" as used in NTN Bearing, means a final court decision of the Court of International Trade, i.e., a decision for which judgment has issued. Decca makes this claim by relying on decisions interpreting Congress' use of the phrase "court decision" in Sections 1516a(c)(1) and (e). See, e.g., Smith Corona Corp., 915 F.2d at 688; Timken, 893 F.2d at 340.

The question is: To which definition was the NTN Bearing court referring?[18]  As noted above, the NTN Bearing court held that

---

[18]    It appears that this court has not provided an entirely consistent explanation of this statutory language, perhaps awaiting further appellate guidance. Compare  Olympia Indus., 30 CIT __, Slip. Op. 06-4 (Eaton, J.) (denying motion to enjoin cash deposit because plaintiff failed to establish irreparable harm); Shandong Huarong Gen. Group Corp. v. United States, 24 CIT 1286, 1292-93, 122 F. Supp. 2d 143,148-49 (2000) (Carman J.) (finding no irreparable harm and that "paying deposits pending Court review is an ordinary consequence of the statutory scheme."); Shree Rama Enters. v. United States, 21 CIT 1165, 1166, 983 F. Supp. 192, 194 (DiCarlo, J.) (where irreparable harm can be shown, grant of an injunction appropriate); Queen's Flowers de Colombia v. United States, 20 CIT 1122, 1125-28, 947 F. Supp. 503, 509 (1996) (Pogue, J.) (enjoining cash deposit where firms would enter bankruptcywithout injunction); Inland Steel Bar Co. v. United States, 18 CIT 14, 16, 843 F. Supp. 1477, 1479 (1994) (Carman, J.) (finding that this court could not, until a final judgment, order Commerce to adjust a cash deposit rate where Commerce had requested a voluntary remand and the remand results determined a different cash deposit rate); Companhia Brasileira Carbureto de Calcio v. United States, 18 CIT 215, 216 (1994) (Restani, J.) ("court decisions rendered pursuant to § 1581(c) do not change the cash deposit rates until the final court decision is issued" but considering motion for injunctive relief); Jeumont Schneider
                                             (footnote continued)

"[b]efore a final court decision, therefore, the agency determination governs entry of merchandise." NTN Bearing, 892 F.2d at 1006. Although declining to define the phrase "final court decision," id. at 1006 n.4, the court cited 19 U.S.C. § 1516a(c)(1) as to the phrase's import and meaning. NTN Bearing, 892 F.2d at 1006. A year later, the Federal Circuit held that Section 1516a(c)(1) was activated upon the "issuance of the [CIT] court decision." Timken, 893 F.2d at 340 (citing 19 U.S.C. § 1516a(c)(1)). Contrasting Congress' use of "court decision" in Sections 1516a(c)(1) and (e) with Congress' use of "final court decision" in 19 U.S.C. § 1516a(e) ("Section 1516a(e)"), the Timken Court held that a "court decision," as used in Sections 1516a(c)(1) and (e), was any decision for which judgment had issued. Timken,

---

Transformateurs v. United States, 18 CIT 647, 652-53 (1994) (Restani, J.) (a change in the cash deposit rate must await finalized judicial review); Federal-Mogul Corp. v. United States, 17 CIT 722, 726, 826 F. Supp. 1442, 1446 (1993) (Tsoucalas, J.) ("This Court agrees that in order to [amend the cash deposit rate] the Court must enter final judgment on this issue pursuant to Rule 54(b)."), Consol. Int'l Auto., Inc. v. United States, 16 CIT 269, 269-70 (1992) (Restani, J.) (ordering the immediate change in the deposit rate even though the sixty-day period for appeal had not yet expired), Chilean Nitrate Corp., 11 CIT at 540 n.2 (1987) (Restani, J.) ("The court rejects defendant's argument that the requirement of cash deposits cannot be enjoined, or that it would not be in the public interest to enjoin the cash deposit requirement, because of the legislative history indicating the need for cash deposits."); Badger-Powhatan, Div. of Figgie Int'l, Inc. v. United States, 10 CIT 241, 250, 633 F. Supp. 1364, 1373 (1986) (Restani, J.) (where Commerce requested voluntary remand "[t]here is no room here for a result which would allow the erroneous deposit rate to continue").

893 F.2d at 340; see also Smith Corona Corp., 915 F.2d at 688 ("This provision makes clear that the decision of the Court of International Trade, or of the Federal Circuit, is of controlling effect when rendered, and that each such decision must be published within ten days after its issuance."). Thus, by relying on Section 1516a(c)(1) as the statutory bar to the NTN Bearing trial court's injunction, NTN Bearing merely held that the administrative determination governs until the Court of International Trade enters a final judgment. Cf. Timken, 893 F.2d at 340 n.6 ("We do, however, agree that a decision must be 'final' in the sense that the CIT has entered final judgment in order to require publication of notice under [§]§ 1516a(c)(1) and (e)."). In this matter, because this court has issued a final judgment adverse to Commerce's original determination -- in contrast to the trial court in NTN Bearing granting only a motion for partial summary judgment -- nothing in NTN Bearing contradicts Decca's claim for relief here.[19]

---

[19]    One may wonder why the NTN Bearing court used the phrase "final court decision" when it drew support from Section 1516a(c)(1) for its analysis. First, the distinction between a "court decision" and a "final court decision" had not yet been drawn – nor had either term been defined when NTN Bearing was decided. Second, in NTN Bearing, the Court of International Trade never entered final judgment. NTN Bearing relied heavily on Melamine Chems., Inc. v. United States, 732 F.2d 924, 934 (Fed. Cir. 1984). The Court of International Trade in Melamine Chems. likewise had not entered a judgment before granting relief. See Timken, 893 F.2d at 341 (noting that this court had only remanded the case). Therefore, as the court maintained in Timken, 893 F.2d

(footnote continued)

This analysis, by itself, merely means that NTN Bearing does not foreclose relief; it does not necessarily mean that Decca is entitled to relief.  It does mean, however, that the law does not limit Commerce's clear duty to comply with a judgment of the Court of International Trade.  See Porto Rico v. Rosaly, 227 U.S. 270, 276 (1913) (the judicial power "confers the authority and imposes the duty to enforce a judgment rendered in the exercise of [that] power."); ICC v. Brimson, 154 U.S. 447, 484 (1894); Am. Grape Growers Alliance for Fair Trade v. United States, 9 CIT 568, 570, 622 F. Supp. 295, 297 (1985) (highlighting the need for timely enforcement of CIT judgments); cf. Borlem S.A.-Empreedimentos Industriais v. United States, 913 F.2d 933, 940 (Fed. Cir. 1990) (noting that the NTN Bearing trial court lacked authority because of a specific statutory bar).  Moreover, the NTN Bearing court's reliance on Section 1516a(c)(1), when considered within context of the Statute and other decisions, does lead to the additional conclusion that Commerce has a clear duty to implement the requested lawful cash deposit rate.

---

at 341, the use of the term "final court decision," at least in Melamine, was to signal that a non-final decision of the Court of International Trade did not have immediate effect on the cash deposit rate, e.g., grants of partial summary judgment and remands. Rather, the Timken court held that the phrase's import and meaning as used in its case law must be defined in relation to the statutory provision it references.  Accordingly, because NTN Bearing referenced 1516a(c)(1) to justify its use of the phrase "final court decision," the court in NTN Bearing held only that the bar on altering the rate of cash deposits operates until this court issues judgment.

Under Section 1516a(c)(1), Commerce is required to publish in the Federal Register a "notice of a decision of the United States Court of International Trade, or of the United States Court of Appeals for the Federal Circuit, not in harmony with [the agency's appealed] determination . . . within ten days from the date of the issuance of the court decision."[20]  The court notes in particular that the Federal Circuit has held that this responsibility ensues upon the issuance of a final judgment by this court.  Timken, 893 F. Supp. at 340.  The Federal Circuit has also held that this notice has legal consequences.  Specifically, such publication suspends liquidation under the original determination pending a final court decision (if not already suspended), see Smith Corona Corp., 915 F.2d at 688, and requires collection of cash deposits prospectively in accordance with Commerce's new determination, see Timken, 893 F.2d at 340 n.3 ("Thus, in the present case, liquidation of CMEC's entries is currently taking place without assessment of antidumping duties, but would be suspended and made subject to collection of estimated antidumping duties of 4.69% upon publication of notice of the March 22, 1989 CIT decision.").  Given that Commerce has published such a notice here, Decca is entitled to the benefits that flow from the issuance of such a notice, i.e., Commerce's duty to implement it.  This much is specifically

_____

    [20]    As noted above, Commerce has published such a notice of the court's judgment at issue here, in its Notice of Court Decision, 71 Fed. Reg. 1,511.

required by <u>Timken</u>.  See <u>Timken</u>, 893 F.2d at 340 ("the agency's determination will govern only that merchandise which is 'entered prior to the <u>first decision of a court</u> which is adverse to that determination." quoting H.R. Rep. No. 317, 96th Cong., 1st 182 (1979) (emphasis in original)).

Commerce appears to reject this analysis claiming that <u>liquidation</u> is not effected until a "final court decision," i.e., one for which appeals have lapsed.  See 19 U.S.C. § 1516a(e). While the truth of this proposition is undeniable, its significance in the case at bar is wanting.[21]  Liquidation is not the same thing as the collection of cash deposits.  See, <u>e.g.</u>, <u>Torrington Co.</u>, 44 F.3d at 1578-79; <u>Timken</u>, 893 F.2d 338-39; <u>Zenith</u>, 710 F.2d at 810 ("Any change in deposit amounts that might be required would be transient and could not affect the amount of dumping duty actually assessed . . . ."); <u>Shree Rama Enters.</u>, 21 CIT at 1166, 983 F. Supp. at 194; <u>Consol. Int'l Automotive, Inc.</u>, 16 CIT at 269- 70. Indeed, the Statute refers to each distinctly.  <u>Compare</u> 19 U.S.C. §§ 1673b(d), 1673d(c)(1)(B)(ii), 1673e(a), 1673e(c)(3), 1675, 1673f(b)(2) <u>and</u> 1677g (referring to cash deposits) <u>with</u> 19 U.S.C. §§ 1500, 1504, 1505, 1514, 1516a <u>and</u> 1520  (referring to

_____

[21]    Commerce is correct insofar as Customs is not required to return <u>previously</u> <u>paid</u> cash deposits until liquidation. Liquidation is the only procedure to refund any overpayments.  <u>NTN Bearing</u>, 892 F.2d at 1006 ("return of estimated duties must await a final court decision and liquidation by the agency in accordance with that decision."); <u>see also</u> 19 U.S.C. §§ 1673f(b)(2), 1677g.

liquidations).  Therefore, neither Commerce nor this court should presume that Congress meant to address cash deposits when it employed the term "liquidation" in 19 U.S.C. § 1516a.   See  2A Norman J. Singer, Statutes and Statutory Construction § 46:06, p. 194 (6th ed. 2000) ("when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended."); Ad Hoc Comm. of AZ-NM-TX-FL Producers of Gray Portland Cement v. United States, 13 F.3d 398, 401 (Fed. Cir. 1994); Timken, 893 F.2d 340 ("It follows that if a word is used in one phrase but omitted in another, the two phrases are intended to mean something different.").  As such, that Customs may only liquidate certain entries in accordance with a final and conclusive decision has no bearing on Customs' responsibilities as to the collection of cash deposits.

In a larger sense, there is good reason why the Statute differentiates between liquidation and the collection of cash deposits.   As recounted above, this court usually suspends liquidation pending court proceedings either by virtue of a preliminary injunction or a court decision not in harmony with the agency determination.  See 19 U.S.C. §§ 1516a(c)(1)&(2).  See also Zenith, 710 F.2d at 810.   Therefore, if Section 1516a(e) were activated on the basis of every decision (conclusive or otherwise) several different instructions may issue for entries on which no liquidation is occurring.    The issuance of these multiple

liquidation instructions would have no utility. Furthermore, without such a stay, parties would not get relief (for goods already entered) from errors committed by Commerce or this court as determined in a final and conclusive decision – a result at odds with the purpose behind appellate review. See Zenith, 710 F.2d at 810.

In contrast, the collection of cash deposits is ongoing. As a result, revised Customs' instructions with regard to cash deposits will have immediate and ongoing consequences. In addition, because cash deposits are estimates of the eventual liability an importer will bear, the remand determination reflects the best estimate of what that liability will be. Cf. Timken, 893 F.2d at 338 n. 3 & 342; Allegheny Ludlum Corp., 346 F.3d at 1373 ("In short, we discern a congressional intent that cash deposit rates be accurate and current . . . ."). Nor will a change in the cash deposit rate interfere with the Federal Circuit's ability to grant parties relief. It is therefore reasonable to collect cash deposits based on Commerce's best estimate of the importer's liability. Without question, these pragmatic considerations weigh against the administrative costs in issuing multiple instructions. Compare Borlem S.A.-Empreedimentos Industriais, 913 F.2d at 939 (noting that avoiding ping-pong and endless renvoi between the court, the Federal Circuit, and agencies may be a relevant consideration in denying relief but is not dispositive) and Timken,

893 F.2d at 342 (noting that this concern does not apply to publishing federal register notices) with Melamine Chems., 732 F.2d at 934 (citing concern of the yo-yo effect). See also supra at note 20.[22]

The issue has been decided. As established by Timken, Commerce has a clear duty to implement the cash deposit rate required by the court's grant of judgment affirming Commerce's remand determination, and Decca has a clear right to the requested writ.

## (C) Appropriate under the Circumstances

Last, the court must consider whether relief is appropriate under the circumstances present here. Commerce asserts that this court's equitable powers are limited by 19 U.S.C. §§ 1516a(c)(2)&(e) in the case at bar, so as to foreclose relief to Decca here. Sections 1516a(c)&(e), however, define the court's authority as to the liquidation of entries. Specifically, as noted

---

[22] As noted above, because it is not impossible that this court's first decision may be overturned, an importer still faces some risk that the original cash deposit rate will be reinstated. Therefore, an importer's risk calculus is the same regardless of the cash deposit rate assigned. However, as discussed above, an importer may encounter significant transaction costs depending on the cash deposit rate. As the prevailing party before this court, there is no reason why an importer should continue to shoulder these transaction costs after this court has entered judgment in favor of the importer. Cf. Am. Hosp. Supply Corp. v. Hosp. Prods., Ltd., 780 F.2d 589, 593-96 (7th Cir. 1985) (Posner, J.).

above, Section 1516a(c)(2)[23] permits the court to preliminarily enjoin the liquidation of entries pending judicial review.  This authority is consistent with the recognition that liquidation is final and conclusive upon the parties and, therefore, if the court's review authority is to be meaningful, such injunctions must issue or else no relief (for the imports in question) may be granted.  See Zenith, 710 F.2d at 810-11.  See generally McKesson Corp. v. Div. of Alcoholic Beverages and Tobacco, Fla. Dept. of Bus. Regulation, 496 U.S. 18, 51 (1990);  South Carolina v. Regan, 465 U.S. 367, 381 n.19 (1984); Ohio Oil Co. v. Conway, 279 U.S. 813, 815 (1929) (where a party may not receive a refund once a tax is paid, a preliminary injunction should issue).  Once the judicial

---

[23]     Title 19 Sections 1516a(c)(2)-(3) provide:

Injunctive relief. In the case of a determination described in paragraph (2) of subsection (a) by the Secretary, the administering authority, or the Commission, the United States Court of International Trade may enjoin the liquidation of some or all entries of merchandise covered by a determination of the Secretary, the administering authority, or the Commission, upon a request by an interested party for such relief and a proper showing that the requested relief should be granted under the circumstances.
(3) Remand for final disposition. If the final disposition of an action brought under this section is not in harmony with the published determination of the Secretary, the administering authority, or the Commission, the matter shall be remanded to the Secretary, the administering authority, or the Commission, as appropriate, for disposition consistent with the final disposition of the court.

process has been exhausted, Section 1516a(e)[24] requires Commerce to liquidate all future entries, and entries for which liquidations were enjoined under Section 1516a(c), in accordance with the final decision.  Therefore, as noted, the provision upon which Commerce relies speaks only to the liquidation of entries; they do not speak to the handling of cash deposits during court proceedings or as a result thereof.

Moreover, when the Court of International Trade properly asserts jurisdiction over a claim, the Court's equitable powers may be exercised unless precluded by statute.  See, e.g., Borlem S.A.-Empreedimentos Industriais, 913 F.2d at 937-40; Shree Rama Enters., 21 CIT at 1166, 983 F. Supp. at 194; cf. Nat'l Corn Growers Ass'n

---

[24]    Title 19 Section 1516a(e) provides:

Liquidation in accordance with final decision
If the cause of action is sustained in whole or in part by a decision of the United States Court of International Trade or of the United States Court of Appeals for the Federal Circuit

(1) entries of merchandise of the character covered by the published determination of the Secretary, the administering authority, or the Commission, which is entered, or withdrawn from warehouse, for consumption after the date of publication in the Federal Register by the Secretary or the administering authority of a notice of the court decision, and

(2) entries, the liquidation of which was enjoined under subsection (c)(2) of this section, shall be liquidated in accordance with the final court decision in the action. Such notice of the court decision shall be published within ten days from the date of the issuance  of the court decision.

v. Baker, 840 F.2d 1547, 1550-60 (Fed. Cir. 1988) (holding that the court may not grant equitable relief where it does not have jurisdiction).  See generally 28 U.S.C. § 1585 (conferring the Court of International Trade all powers in law and equity).

Finally, and importantly, given the low probability that Decca's goods will be liquidated at the extraordinary 198.08% rate, and Commerce's decision not to appeal this court's decision, cf. Dows v. City of Chi., 78 U.S. (11 Wall.) 108, 110 (1870), granting relief is appropriate here.


**CONCLUSION**

For the foregoing reasons, Decca's motion for mandamus is granted.


                                                    _____/s/_____
                                                    Donald C. Pogue, Judge

Dated:     April    4, 2006
           New York, NY